No. 85-372

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

---

STATE OF MONTANA,

        Plaintiff and Respondent,

  -vs-

JOHN F. LANCE,

        Defendant and Appellant.

---

APPEAL FROM:  District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable Leonard Langen, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        John F. Lance, pro se, Florence, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
Joe R. Roberts, Asst. Attorney General, Helena
Robert L. Deschamps, III, County Attorney, Missoula,
Montana

---

Submitted on Briefs: Jan. 17, 1986

Decided:   June 17, 1986

Filed: JUN 17 1986

*Ethel M. Harrison*

———————————————————
Clerk

Mr. Chief Justice J. A. Turnage delivered the Opinion of the Court.

After a jury trial in the District Court of the Fourth Judicial District, appellant, John Fesler Lance, was convicted of violating § 45-5-203(1)(b), MCA (1983)[1] which provides:

> A person commits the offense of intimidation when, with the purpose to cause another to perform or to omit the performance of any act, he communicates to another a threat to perform without lawful authority any of the following acts:
>
> . . .
>
> (b) subject any person to physical confinement or restraint.

On appeal, Lance contends that this statute is an unconstitutional violation of the First Amendment, and he claims that several other errors occurred in the lower court which require reversal of his conviction. Since we uphold the constitutionality of the Montana intimidation statute and find no merit in the other issues raised, the judgment of conviction is affirmed.

The events leading up to Lance's arrest and conviction began over seven years ago when he was served with a petition for divorce. Lance chose to represent himself in those proceedings, as he does in this case. When the decree of dissolution was granted, Lance lost custody of his children and a substantial amount of marital property. Sometime later, he lost possession of his very valuable ranch in Florence, Montana. From that point to the present, Lance has carried on a one-man crusade to recover his ranch, custody of his children and alleged substantial damages he has sustained

---

[1]    This statute was amended subsequent to Lance's conviction.

in the process. Numerous lawsuits have been filed by Lance in the state and federal courts in an effort to obtain these things; however, he has been met with constant defeat and dismissal of many of his actions. This lack of success has convinced Lance that there is a colossal conspiracy against him by most of the judiciary and attorneys in Montana. It is Lance's quest for final justice and his obvious frustration over his losses which has ultimately led to the conviction at issue in this case.

Five separate letters written and mailed by Lance form the basis for his arrest and conviction. These letters were dated July 17, 1984, August 15, 1984, September 3, September 8, and September 13, 1984, and were sent to Nate Denman,[2]

---

2    Two separate letters were mailed by Lance to Denman. Pertinent excerpts which constitute the threats for which Lance was convicted follow:

First letter    " . . . the answer--to focus public attention on what has taken place --is violence. And I mean taking a hostage which would put this story on page one of every newspaper. My defense at a jury trial I would request later would be 'all of the above.' . . . In short, if the road to the ranch is cut off, litigation stops and I am ready to turn to violence to reach my ends . . . A coverup will never work here because I am ready to put down my life and my personal freedom, if necessary, to expose all of this. Further, I believe I am perfectly capable of getting that hostage in hand, and capable of negotiating for his/her release. There are no concrete plans now. No hostage is positively select- ed. No dates have been set. No location has been selected . . . But if they do, the final straw is violence." (Emphasis his.)

Second letter:

"All my life I have sought to avoid violence. Always there has been another way out. Here it is not possible . . . Those incidents alone, Denman, will allow me to proceed to violence in a desperate, last ditch quest for final justice. With a key hostage in hand, I will negotiate. There are no alternatives . . . I will bring the Governor into this and probably Dean of the Law School, but only when hostage is in hand. Then we will go to radio, TV, newspa- pers, other media. This story will be told--over a telephone--by John Lance. Hour after hour unless the law

Judge Michael Keedy,[3] Tom Wing,[4] and Judge Jack Green,[5] respectively. Basically, Lance stated in the letters that if his remaining lawsuits are dismissed, he will take a hostage

---

presses me. In that event, they will choose violence. And there are times when violence is the only way to create change . . . I will pay any price--take any risk--to even the score . . . If you think my 'objections' raise eyebrows (they do) just wait. The real exposure has not even begun. There are a lot of targets. With a hostage in hand, I will have an attentive audience." (Emphasis his.)

3    Pertinent excerpts of the letter are:

"I of course expect to have my main federal lawsuit dismissed. There is no justice in any of this.

. . . If a federal dismissal comes, I will of course appeal to the Supreme Court of the United States but there I will have about a 2% chance of having the appeal heard. So at that point the whole contest will really be removed to the 'streets of Dodge' for resolution and I of course plan to put this whole story at that time on the front page of every newspaper in the U.S. . . . The contest will continue until I have my ranch and my children and damages determined by a jury.

4    Pertinent excerpts of the letter are:

"Enclosed is a copy of my letter to Denman dated August 15, 1984. I believe it indicates where I stand with regard to Denman and with regard to the use of violence to find final justice or to upset the impropriety found today in this court system. . . Then when I do act - when the relief has not come through the courts - the record will clearly indicate what is wrong, who is wrong, and why it remains wrong. From a telephone, my hostage and I will negotiate. There will be no violence unless the 'System' then initiates violence by attempting to reach the hostage. That provocation would result in violence without question. But I will have the right hostage and if violence comes, there will be very, very little loss to society."

5    Pertinent excerpts of the letter are:

"However, I can tell you one thing I do know. I will fight for final justice here to the very end of my life. It is my intent and I have resolved that if these lawsuits are improperly dismissed on appeal, I will at that point take the necessary action to put this entire matter on the front page of every newspaper in the United States of America. Needless to say, this will not be done by writing to the editors of each newspaper. It will take a substantial public act to reach this goal and it is my belief that regardless of the

for the purpose of focusing nationwide media attention on his plight and for the purpose of negotiating to obtain the return of his ranch and his children, and for the damages he has sustained. Nate Denman was particularly alarmed by the letters he received, and he sent relevant excerpts of them to the Director of the Montana State Hospital at Warm Springs who, in turn, sent the excerpts to the County Attorney in Hamilton, Montana. Subsequently, on September 19, 1984, the Missoula County Attorney filed an Information charging Lance with the offense of intimidation.

Lance was arrested on September 20, and bail was initially set at $500,000. However, one week later bail was reduced by the District Court to $50,000, and on November 8 Lance was released on his own recognizance. During this time, Lance brought an application for writ of habeas corpus alleging that § 45-5-203, MCA, was unconstitutional on its face and as applied. On November 1, 1984, the District Court issued an opinion upholding the constitutionality of that statute and denying the application for the writ. On December 6, the court accepted the State's motion to file an amended information. Trial was set for January 28, 1985 and on January 30 the jury found Lance guilty of intimidation. Lance conducted his own defense at trial and continues his pro se status on appeal.

Appellant has raised numerous issues, both formally and informally, in his lengthy brief. The precise issues raised

---

personal consequences to me, that act must be done here if the judicial system denies me my just and proper right to jury trials for these defendants who are clearly corrupt and who have quite obviously conspired against me."

were difficult to discern in view of the fact that they were intertwined with rambling attacks on the judiciary and attorneys of Montana, in addition to allegations of a massive conspiracy designed to prevent him from recovering what he lost in the divorce seven years ago. Nevertheless, we believe that there are six issues which are legitimately raised:

(1) Does § 45-5-203(1)(b), MCA (1983), violate the First Amendment because it is overbroad or because it is unconstitutional as applied?

(2) Was reversible error created by the fact that bail was originally set at $500,000 but was reduced to $50,000 one week later, in light of the fact that appellant was released on his own recognizance six weeks later?

(3) Was appellant denied his constitutional right of access to the courts during his six week pre-trial confinement by being denied access to a substantial legal library and by the failure of his court appointed counsel to comply with every request he made?

(4) Was reversible error created when the prosecutor obtained juror affidavits before a mistrial hearing was held which was based on alleged witness misconduct occurring at the trial without first acquiring the court's permission to do so?

(5) Did the trial court abuse its discretion by accepting the second amended information?

(6) Did the trial court abuse its discretion by failing to allow appellant a continuance so he could file proposed jury instructions, which resulted in proposed jury instructions being filed only by the prosecution?

6

Another issue raised by appellant involves his allegations of conspiracy and corruption within the legal community in Montana. Since this issue is totally irrelevant to his appeal and consists largely of groundless speculation, we do not consider it in our decision.

I

Since appellant's first issue requires us to construe Montana's intimidation statute with the commands of the First Amendment in mind, and because there may be some doubt as to its constitutionality after the federal court decision in Wurtz v. Risley (9th Cir. 1983), 719 F.2d 1438, we will discuss this issue in some detail.

A

Appellant first contends that § 45-5-203 is unconstitutional on its face because it is overbroad. This statute is particularly susceptible to an overbreadth attack because it makes criminal a form of pure speech. Subsection (b) imposes criminal liability when a person "communicates to another a threat" to subject any person to physical confinement or restraint without lawful authority and with the purpose of causing another to perform or omit the performance of any act. Thus, the heart of the offense is communication. No overt act or conduct of any kind is required. Although the statute requires the communication of a threat to take some specific act coupled with a criminal state of mind, the offense is complete upon the communication of the threat. Only words are punished by the statute. Therefore, it can withstand appellant's attack upon its constitutionality only if it does not apply to speech that is protected by the First

Amendment. Gooding v. Wilson (1972), 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408.

The doctrine of overbreadth in the area of First Amendment freedom of speech is an exception to the normal rules of standing. This doctrine allows appellant to raise an objection to § 45-5-203 on First Amendment grounds even though the statute would have been constitutional as applied to his particular case. "It matters not that the words [appellant] used might have been constitutionally prohibited under a narrowly and precisely drawn statute." Gooding, 405 U.S. at 520. "[A]n individual whose own speech or expressive conduct may validly be prohibited or sanctioned is permitted to challenge a statute on its face because it also threatens others not before the court--those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." Brockett v. Spokane Arcades, Inc. (1985), ____ U.S. ____, 105 S.Ct. 2794, 2802, 86 L.Ed.2d 394, 405-406. Thus, the statute may be unconstitutional on its face even though it would be constitutional as applied to appellant.

Section 45-5-203(1)(c)[6] has been declared unconstitutional by the Ninth Circuit in Wurtz on grounds of overbreadth. Appellant contends that Wurtz controls the decision in this case. We disagree with this view for two reasons.

First, only subsection (c) was at issue in Wurtz, and the court considered the overbreadth challenge solely with

---

6    Subsection (c) made it unlawful to threaten to "commit any criminal offense."

regard to that subsection. The court did not declare the entire intimidation statute to be unconstitutional; rather, it held only § 45-5-203(1)(c) to be unconstitutional. It is an elementary principle of constitutional law that "the same statute may be in part constitutional and in part unconstitutional, and that if the parts are wholly independent of each other, that which is constitutional may stand while that which is unconstitutional will be rejected." Brockett, 105 S.Ct. at 2801, quoting from Allen v. La. (1881), 103 U.S. 80, 83-84, 13 Otto 80, 26 L.Ed. 318.

We view the separate subsections of the statute as completely independent of each other. It was the legislature's purpose to impose criminal sanctions on individuals who threaten to commit certain specific acts. Simply because threats to "commit any criminal offense" were held to be unconstitutional does not mean that the legislature would not want to continue punishing threats to "subject any person to physical confinement or restraint." One prohibition in the statute does not hinge on another. Therefore, the decision in Wurtz declaring subsection (c) to be unconstitutional does not state the applicable law in this case.

Secondly, Wurtz is not controlling here because it was decided without the benefit of recent United States Supreme Court cases clarifying the analysis to be applied in determining whether a statute is overbroad. Broadrick v. Oklahoma (1973), 413 U.S. 601, 615, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830, 842, established that where speech is combined with conduct, "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." (Emphasis added.) There was some question after Broadrick whether substantiality was

applicable where pure speech was involved. However, that question was answered in New York v. Ferber (1982), 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113.

The statute at issue in Ferber prohibited distribution of child pornography. Admittedly, only speech was involved, and the question left unanswered in Broadrick was directly presented. The Court held:

> This case, which poses the question squarely, convinces us that the rationale of Broadrick is sound and should be applied in the present context. . . .
>
> . . .
>
> The premise that a law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications is hardly novel. On most occasions involving facial invalidation, the Court has stressed the embracing sweep of the statute over protected expression.

Ferber, 458 U.S. at 771.

The Court reiterated in Brockett that the substantial overbreadth doctrine applies to pure speech. In footnote 12, the Court stated: "The Court of Appeals erred in holding that the Broadrick substantial overbreadth requirement is inapplicable where pure speech rather than conduct is at issue. New York v. Ferber (cite omitted) specifically held to the contrary." Brockett, 105 S.Ct. at 2802.

Applying the foregoing principles to the present case, we hold that § 45-5-203(1)(b) is not substantially overbroad. It prohibits threats to subject any person to physical confinement or restraint without lawful authority with the purpose of causing another to perform or omit the performance of any act. Although the statute uses the words "physical confinement or restraint," we construe the word "restraint" to mean a "physical" restraint. The statute does not punish

any threat to subject another to some form of mental or psychological restraint. Only threats to subject another to a physical confinement or a physical restraint are punishable. Clearly the State has a legitimate and considerable interest in preventing persons from threatening to take a hostage or impose some other unlawful physical restraint on another for the sole purpose of attaining some end. Appellant has not identified, and we are unable to find, any situations where a person would be constitutionally permitted to make such a threat. Although it might be possible that some rare situations will arise in the future where a person could constitutionally threaten to take a hostage to accomplish some end, those possible unconstitutional applications of the statute are not sufficient to invalidate it on its face. As Ferber said, quoting from Parker v. Levy (1974), 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439:

> This Court has . . . repeatedly expressed its reluctance to strike down a statute on its face where there were a substantial number of situations to which it might be validly applied. Thus, even if there are marginal applications in which a statute would infringe on First Amendment values, facial invalidation is inappropriate if the "remainder of the statute . . . covers a whole range of easily identifiable and constitutionally proscribable . . . conduct . . . " (Citation omitted.)

Ferber, 458 U.S. at 770, Fn. 25.

Therefore, since appellant has been unable to identify any substantial applications of the statute to constitutionally protected speech and has not shown how the statute impacts differently on third parties not before the Court, his claim that the statute is unconstitutionally overbroad must fail.

11

B

We now proceed to determine whether § 45-5-203(1)(b) is unconstitutional as applied to appellant. We note at the outset that the statute carries a heavy burden since it seeks to prohibit pure speech without any requirement of an overt act. However, this fact alone is not sufficient to invalidate such a statute. It is only when a statute prohibits "protected" speech that it will be found to be unconstitutional, keeping in mind, however, that the vast majority of speech is protected.

Beginning at least as early as 1919, the United States Supreme Court recognized that the right to speak one's mind on any subject at any time was not the intent of the First Amendment. Justice Holmes wisely observed that "[t]he most stringent protection of free speech would not protect a man in falsely shouting fire in a theater, and causing a panic." Schenck v. United States (1919), 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470, 473. The Court gave greater scope to this doctrine over twenty years later in Chaplinsky v. New Hampshire (1942), 315 U.S. 568, 86 L.Ed. 1031, 62 S.Ct. 766. The Court stated:

> Allowing the broadest scope to the language and purpose of the Fourteenth Amendment, it is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problems. These include the lewd and obscene, the profane, the libelous, and the insulting or "fighting" words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth

12

that any benefit that may be derived
from them is clearly outweighed by the
social interest in order and morality.

Chaplinsky, 315 U.S. at 571-572.

Thus, Chaplinsky established that "fighting words" do not come within the protection of the First Amendment.

Roth v. United States (1957), 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, established another exception to constitutionally protected speech. The Court observed that "the First Amendment was not intended to protect every utterance," and held that "obscenity is not within the area of constitutionally protected speech or press." Roth, 354 U.S. at 483, 485. The Court took a further step in Ferber. There it held that child pornography, even though it may not meet the standards established for obscenity, is not speech protected by the First Amendment. The Court based its holding in large part on a finding that the state's interest in regulating child pornography was of "surpassing importance," and by finding that the evil sought to be prevented overwhelmingly outweighs the expressive interests involved.

With these firmly established principles as our guide, and ever mindful of the stringent protection of speech required by the First Amendment, we hold that threats of the kind prohibited by § 45-5-203(1)(b) are not speech protected by the First Amendment. The State has a substantial, if not overwhelming, interest in preventing intimidation of the public and the resulting fear and anxiety caused by these terroristic-type threats. "It has been clear since this Court's earliest decisions concerning the freedom of speech that the state may sometimes curtail speech when necessary to advance a significant and legitimate state interest." City Council v. Taxpayers for Vincent (1984), 466 U.S. 789, 804,

13

104 S.Ct. 2118, 2128, 80 L.Ed.2d 772, 786. The value to society of permitting threats of this nature is minuscule at best. Furthermore, the statute does not aim at discriminating between different types of speech, nor does it prohibit any constitutionally protected speech. The threats prohibited by it are punishable whatever their purpose and however noble the ultimate goal of the threatener may be. The statute is based on content only insofar as to determine whether a prohibited threat is involved in the speech.

> Thus, it is not rare that a content-based classification of speech has been accepted because it may be appropriately generalized that within the confines of the given classification, the evil to be restricted so overwhelmingly outweighs the expressive interests, if any, at stake, that no process of case-by-case adjudication is required.

Ferber, 458 U.S. at 763-764.

The proposition that specific types of threats do not come within the protection of the First Amendment has been given firm support by the United States Supreme Court and several lower federal courts. In Watts v. United States (1969), 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664, 667, a case involving threats against the President, the Court had no difficulty in finding that "the statute under which petitioner was convicted is constitutional on its face." Similarly in United States v. Howell (5th Cir. 1983), 719 F.2d 1258, 1261, the court held:

> Not all utterances are afforded the same degree of first amendment protection; whatever contribution statements like Howell's may make to the "uninhibited, robust, and wide-open" debate on public issues to which this nation is committed, the compelling governmental interest in protecting the safety of the Chief Executive has been thought to outweigh it.

14

Howell had been convicted of threatening the life of the President for making the statement: "If released, I would make my way to Washington and kill him--I will kill the President."

However, § 45-5-203 does not prohibit all speech which is "threatening." "What is a threat must be distinguished from what is constitutionally protected speech." Watts, 394 U.S. at 707. We find that implicit in the word "threat", as used in the intimidation statute, is a requirement that it be communicated under circumstances which reasonably tend to produce a fear that the threat will be carried out. This implicit requirement has been made explicit by the legislature in its 1985 amendment of the statute. Furthermore, the threat must be a "true threat." Threats which are, when taken in context, made in jest or which are simply "political hyperbole" are not punishable under the statute. Watts, supra. Mere advocacy of the use of force or violence to accomplish some end also does not constitute a threat under the statute since that form of expression is protected by the First Amendment. NAACP v. Claiborne Hardware Co. (1982), 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215; Brandenburg v. Ohio (1969), 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430. Rather, only serious expressions of an intention to take a hostage, murder, inflict serious injuries on persons or property, or commit a felony, for the purpose of accomplishing some end constitute a threat punishable under the statute. However, the question of intention is to be decided on the basis of an objective standard, United States v. Kelner (2nd Cir. 1976), 534 F.2d 1020, and whether a statement constitutes a true threat is to be determined by the trier of

15

fact.    United States v. Merrill (9th Cir. 1984), 746 F.2d 458; Howell, supra.

We hold that appellant's statements constitute threats punishable under § 45-5-203(1)(b).   He repeatedly wrote that he would take a hostage in order to bring public attention to his plight and for the purpose of securing the return of his ranch, his children, and the monetary damages he has suffered.   (See especially Fn. 2 and Fn. 4.)   These statements were more than mere political opposition to the Montana legal system, as appellant contends on appeal.   They were serious threats to take a hostage in order to attain his goals.   This type of speech is so inimical to society and plays such a minimal part in the exposition of ideas that the State may constitutionally prohibit it.   An individual cannot be permitted to terrorize members of the public through threats, and then claim protection from prosecution under the First Amendment.   Freedom of speech was never meant to be stretched to the point where more injury is done to society as a whole than good.   Furthermore, the statute is narrowly tailored to accomplish the State's asserted purpose--caustic, abusive, and robust speech is fully protected until it rises to the level of threats which cause harm to society.   "The ordinance curtails no more speech than is necessary to accomplish its purpose."  City Council, 466 U.S. at 810.

Under the commands of the First Amendment, we have scrupulously reviewed appellant's conviction.   We hold that the Montana intimidation statute is neither unconstitutionally overbroad, nor is it unconstitutional as applied.

## II

Appellant contends next that reversible error was created by the lower court in setting his bail at $500,000 originally, and then in setting it at $50,000 one week later. The imposition of bail is an area which is largely within the discretion of the trial court, and the amount set will always be upheld if it is reasonable. State v. McLeod (1957), 131 Mont. 478, 311 P.2d 400. However, it is not necessary for us to decide whether $50,000 was a reasonable amount in appellant's case because the issue is moot.

Appellant was released on his own recognizance at least two and one half months before his trial began. Under the circumstances, this was an adequate amount of time to enable this pro se defendant to prepare his case. Appellant has not demonstrated any prejudice which may have resulted by having only two and one half months to prepare his case, and has not shown how having the extra month and one half he spent in confinement would have materially benefitted his defense. We find no error on this basis.

## III

Appellant contends that he was unconstitutionally denied access to the courts during his pre-trial confinement by being denied access to a substantial legal library and by certain inadequacies of his court appointed counsel.

Appellant is correct in his assertion that a prisoner has a constitutional right of access to the courts. However, the cases appellant cites in support of this rule and others that we have been able to locate are concerned solely with the right of indigent prisoners. Johnson v. Avery (1969), 393 U.S. 483, 490, 89 S.Ct. 747, 751, 21 L.Ed.2d 718, 724,

held only that unless the "State provides some reasonable alternative to assist inmates in the preparation of petitions for <u>post-conviction</u> relief, it may not validly enforce a regulation . . . barring inmates from furnishing such assistance to other prisoners." (Emphasis added.) Bounds v. Smith (1977), 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72, 83, went a step further and held:

> [T]he fundamental constitutional right of access to the courts requires <u>prison authorities</u> to assist <u>inmates</u> in the preparation and filing of meaningful legal papers by providing prisoners with <u>adequate</u> law libraries or <u>adequate</u> assistance from persons trained in the law. (Emphasis added.)

Nowhere is there a requirement that county jails provide persons awaiting trial with a substantial legal library. The only requirement is that prisons provide inmates with adequate legal libraries or some other reasonable alternative. We express no opinion on whether this constitutionally mandated requirement extends to persons awaiting trial while in county jails, nor as to whether it extends to non-indigents. Rather, we find that appellant was in fact provided with a reasonable alternative to an adequate legal library.

Appellant chose to proceed pro se in defending the charge brought against him and in his action for writ of habeas corpus. Even though appellant was not indigent, the court appointed counsel to assist him in doing legal research. Counsel made copies of cases appellant requested, did some independent research for appellant, and allowed appellant the use of his own Montana codes. The sheriff at the county jail made every effort to accommodate appellant's request to do research at the jail and to prepare his brief. The resulting brief appellant filed in support of the writ of

18

habeas corpus was 47 typed pages long and it cited numerous cases, the majority of which represented the relevant law on the subject. We find that appellant was provided with more than adequate legal assistance during the short time he was incarcerated, and that his right of access to the courts was not denied.

## IV

Sometime after the trial had concluded, appellant moved for a mistrial on the basis of alleged misconduct by a witness during the trial. It appears that during Mr. Denman's testimony the court recessed, and appellant, the county attorney, and the judge went into chambers. While they were out, one of the jurors asked the bailiff if he could be excused to go to the bathroom. Mr. Denman replied that the juror had a constitutional right to do so. Before the mistrial hearing was held, the prosecutor obtained, without first acquiring the court's permission, affidavits from several jurors which generally stated that the remark was taken as a joke and had no influence on their decision. Appellant contends that the prosecutor's action deprived him of due process of law.

Appellant has not cited a single case which holds that the taking of juror affidavits by the prosecutor after trial amounts to a denial of due process. We fail to see how he could have been prejudiced in anyway by these actions. Furthermore, he has not demonstrated any prejudice to his case by the humorous remark made by the witness. No substantial rights of appellant were affected by the witness's remarks nor by the prosecutor's conduct. Therefore, if there

19

was any error, it must be disregarded.  Section 46-20-702, MCA.

V

Appellant contends next that the trial court committed error by its acceptance of the Second Amended Information. He bases this contention on two grounds:  (1) the amended information failed to include all of the necessary elements because it did not state that the threat was made to the "victim" as required by State v. Wurtz, and (2) appellant was not given proper notice of the hearing held to address the proposed filing of the amended information, in violation of the Fourteenth Amendment.

Appellant is correct in his reading of State v. Wurtz (Mont. 1981), 636 P.2d 246, 38 St.Rep. 1808.  That case stated:

> There are three elements which the State must prove in order to sustain a charge of intimidation:  (1) that the defendant communicated to the _victim_ a threat to commit one or more of the acts enumerated in section 45-5-203(1); (2) that the defendant was without legal authority to perform the threatened act; and (3) that the defendant had the purpose to cause the _victim_ to perform or omit the performance of any act.  (Emphasis added.)

_Wurtz_, 636 P.2d at 250.  Under this definition, if the victim to whom the threat is made is required to be the same victim which defendant had the purpose of causing to perform an act, appellant could not have been properly charged under the statute because he communicated threats to four different individuals with the purpose of causing either the State of Montana or the Montana judiciary to perform an act; i.e., the person threatened differed from the person sought to be coerced.

20

The language of § 45-5-203 does not use the word "victim"; rather, the word "another" is used. We believe that it is within the language and intent of the statute that the person who receives the threat can be different from the person who is sought to be compelled by the threat. Otherwise, for example, an individual could contact the news media threatening to take the life of a hostage if the Governor does not meet his demands, and he could not be convicted under this statute. But it is this very situation which the statute is aimed at outlawing. Therefore, we find that the decision in State v. Wurtz gave too narrow a reading of the statute, and we overrule it to the extent that it is inconsistent with this opinion. Considering "another" with regard to its plain meaning, the amended information sufficiently charged appellant with the crime of intimidation. Furthermore, viewing the amended information together with the contents of the supporting affidavit, it is clear that the State intended to prove the offense of intimidation and that sufficient facts were set forth to establish probable cause for that offense, which is all that was required for the court to accept the amended information. State v. Longneck (1981), 196 Mont. 151, 640 P.2d 436; State v. Hamilton (1980), 185 Mont. 522, 605 P.2d 1121.

As to appellant's assertion that he was not given sufficient notice of the hearing, § 46-11-403, MCA states the applicable rule:

> (1)(a)  An information may be amended in matters of substance at anytime not less than 5 days before trial with leave of court.
>
> . . .
>
> (c)  If the motion is timely and the amended information is supported by

21

probable cause, the court shall grant leave to amend.

. . .

(e) The defendant shall have a reasonable period of time to prepare for trial on the amended information.

The amended information was accepted by the court on December 6, 1984, and trial began on January 28, 1985. Under the circumstances, this was a reasonable amount of time for appellant to prepare for trial on the amended information, which did not differ materially nor state a separate charge from the original information. Nowhere in the statute is there a requirement that a defendant be given notice before the amended information may be accepted by the court, nor is such notice required by due process. The trial court did not err in its acceptance of the amended information.

VI

Finally, appellant contends that the trial court erred by not granting him a continuance so that he could file proposed jury instructions. Under § 46-13-202(3), MCA,

[a]ll motions for continuance are addressed to the discretion of the trial court and shall be considered in the light of the diligence shown on the part of the movant. This section shall be construed to the end that criminal cases are tried with due diligence consonant with the rights of the defendant and the state to a speedy trial.

The only reason appellant gave in support of his motion was that because of all his other pending lawsuits, he simply did not have time to prepare the proposed instructions. Appellant chose to proceed pro se, and he will be held to the same standards applied to attorneys. Excuses based on lack of time to prepare because of other commitments are among the

22

most frequently used by attorneys and are the least likely to justify a continuance. State v. Paulson (1975), 167 Mont. 310, 315, 538 P.2d 339, 342, held:

> Motions for continuance are addressed to the discretion of the trial court and the granting of a continuance has never been a matter of right. (Citation omitted.) The district court cannot be overturned on appeal in absence of a showing of prejudice to the movant.

Over four months elapsed between the time appellant was arrested and the time when trial began. This was ample time for appellant to prepare his case, and the reason given in support of his motion for continuance was totally insufficient. We find no prejudice to appellant by the court's denial of his motion.

The judgment of conviction is affirmed.

_____
Chief Justice

We concur:

_____

_____

_____

_____

_____

_____
Justices

23