No. 90-433

IN THE SUPREME COURT OF THE STATE OF MONTANA

1991

STATE OF MONTANA,

       Plaintiff and Respondent,

  -vs-

ANDREW P. FELANDO,

       Defendant and Appellant.

APPEAL FROM:  District Court of the Twentieth Judicial District,
In and for the County of Lake,
The Honorable C. B. McNeil, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          Benjamin R. Anciaux, Attorney at Law, Polson,
Montana

      For Respondent:

          Hon. Marc Racicot, Attorney General, Helena, Montana

          Patricia J. Jordan, Assistant Attorney General,
Helena, Montana

          Larry J. Nistler, Lake County Attorney, Polson,
Montana

Submitted on Briefs: February 14, 1991

Decided: April 22, 1991

Filed: APR 22 1991

FILED

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from the District Court of the Twentieth Judicial District, Lake County, Montana. The appellant, Andrew P. Felando, was convicted, by jury verdict, of intimidation, a felony, and assault and disorderly conduct, both misdemeanors. Felando appeals his convictions. We affirm in part and reverse in part.

The issues presented by appellant are:

1) Whether the venue of the misdemeanor assault charge was properly in Lake County.

2) Whether the evidence is sufficient to support all three convictions.

Andrew P. Felando was charged by information with the offenses of felony intimidation as defined by § 45-5-203(2), MCA; misdemeanor assault as defined by § 45-5-201(1)(d), MCA; and disorderly conduct as defined by § 45-8-101, MCA. The facts alleged in the information were as follows:

### Count I [Intimidation]

That on or about May 23, 1989, in Lake County, Montana, the . . . Defendant, [Felando] knowingly communicated a threat of a pending fire to Janet Read, which would endanger her life and her home.

### Count II [Assault]

That on or about the month of March, 1989, in Lake County, Montana, the . . . Defendant, purposely or knowingly caused reasonable apprehension of bodily injury in James R. Underwood by threatening to kill him.

### Count III [Disturbing the Peace]

That on or about May 20, 1989, in Lake County, Montana, the . . . Defendant, disturbed the peace by

2

making loud or unusual noises and using threatening, profane or abusive language and discharging firearms.

Following a jury trial on April 12 and 13, 1990, the defendant was convicted of the charged offenses. The defendant was sentenced to ten years in prison with five suspended on Count I, six months in jail on Count II, and ten days in jail on Count III, to be served concurrently. Appellant now appeals his convictions.

The standard of review on issues of substantial evidence is that the conviction cannot be overturned if the evidence, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. State v. Laverdure (1990), 241 Mont. 135, 785 P.2d 718. Both sides presented extensive testimony to foster their respective claims. The testimony conflicted in many areas. The jury, as fact finder, was left to decide which witnesses were most credible. The weight of the evidence and the credibility of the witnesses are exclusively within the province of the jury for its own determination. Laverdure at 138, 785 P.2d at 720.

I

ASSAULT

Appellant was convicted of violating § 45-5-201, MCA which provides:

(1) A person commits the offense of assault if he:

. . .

(d) purposely or knowingly causes reasonable apprehension of bodily injury in another.

3

Jim Underwood and appellant were neighbors. Underwood testified that in March of 1989, while talking from their parked vehicles on Whitetail Road in Lake County, appellant and Underwood's conversation became heated when Underwood asked appellant if he was the one who had posted a sign which labeled Dale Matitus as a poacher. After appellant denied posting the sign, Underwood responded "it sounds like something you [appellant] would do." Upon that statement, Underwood testified that appellant began "hollering and screaming, calling me filthy names." Appellant ceased the verbal onslaught when Underwood's four-year-old son stood up from inside Underwood's vehicle and came into appellant's view.

Underwood and his passenger, Rick Sorenson, both testified that, during this confrontation, appellant threatened to shoot anyone that accused him of posting the sign. Appellant denied making the threat. Underwood also testified he did not perceive appellant to be a threat at that time. To this end, the following testimony was elicited from Underwood during cross examination:

Q. [By Counsel]: Well, did you fear at the time you were up on the road that he [Felando] would shoot you?

A. [By Underwood]: No, I did not.

A few days after the Lake County confrontation, appellant allegedly told Mike Wood to relay a threat to Underwood that appellant would shoot Underwood "if he messed with him." Mike Wood is a neutral party and an acquaintance of both appellant and victim. Mike Wood testified that upon making this second threat, appellant was obviously upset, was red in the face, and was to be taken

4

seriously. However, regarding this alleged threat, Wood's testimony inherently conflicts since he also testified that: "I've known Andy and I didn't take it real serious." Wood and Underwood both testified that when Wood communicated this threat to Underwood, Underwood was frightened. Appellant denied ever making this second threat.

Roughly one week later appellant and Underwood had a second hostile confrontation at the Ferndale store which is located in Flathead County. Underwood testified, along with passenger Dale Matitus, that appellant stated he <u>would have shot</u> Underwood, on Whitetail Road during their prior Lake County encounter, <u>if not for</u> the presence of Underwood's son. Appellant denied making this statement, and denied ever making any such threat. Underwood testified, during cross examination, as follows:

Q. [By Counsel]: And did you fear at the time of being at the store that he [Felando] would have shot you?

A. [By Underwood]: I didn't figure he'd shoot me at the store. I figured maybe if he seen me on the roadside somewhere he'd probably shoot, yes; or if he seen me out in my yard when he was driving by, yes.

The jury heard all the testimony and viewed the witnesses as they testified. Based on the evidence, the jury convicted the appellant of misdemeanor assault. Appellant now argues that the State failed to prove that the victim had any apprehension of bodily injury, that the victim's apprehension, if any, was unreasonable, and that the requisite mental state of appellant was not proven.

The defense's first argument is totally without merit since it completely ignores Underwood's unequivocal testimony that he did

5

indeed think appellant might very well shoot him. This Court will not substitute its judgment for that of the jury; a jury which, in this case, was able to view firsthand the evidence presented, observe the demeanor of the witnesses, and weigh the credibility of each party.

The defense next contends that Underwood's apprehension was unreasonable. We agree. Consider threat #1, alleged to be made in Lake County. This threat communicated the general message that appellant would shoot anyone who accused him of posting a certain sign. Underwood testified that this threat did not cause apprehension of bodily harm. Underwood did not recant this testimony. Next, consider threat #2 communicated to Underwood through Mike Wood. Appellant denies the threat. Wood, as the State's witness, testified during direct as follows:

Q. [By Counsel]: When you spoke to Mr. Felando in March of '89 about Mr. Underwood, what did the defendant tell you?

. . .

A. [By Wood]: . . . he said that the next time he seen Jim [Underwood] "he just better watch it." He was going to mess with him basically.

Q: Andy said what? The defendant Andy Felando said what?

A. He was basically going to mess with him.

Q. What did "mess with him" mean?

A. Well, basically shoot at him or kill him.

During cross examination, Wood further clarified the alleged threat:

Q. [By Defense Counsel]: What were [Felando's] exact

6

words, if you can recall?

. . .

A. Well basically, just like I said, [Felando] just threatened Jim's [Underwood's] life. He said he was going to shoot him the next time he messed with him is what it boils down to, you know. And I took Andy seriously.

. . .

Q. So all Underwood had to do in avoiding getting shot is not mess with Andy, right?

A. I guess. That's what it boiled down to in my opinion. . . .

In our opinion, if indeed appellant made such a statement, the only thing appellant promised to do was defend himself in the event that somebody "messed" with him. How appellant chose to define the phrase "mess with" is as uncertain as the evidence which tended to establish that making this statement amounted to misdemeanor assault. Appellant's alleged statement evidenced a strong desire of his to simply be left alone, and although hostile, this statement was not criminal.

Lastly, consider threat #3 allegedly made at the Ferndale store. Appellant is alleged to have said to Underwood something to the effect of: if not for the presence of your son, I would have shot you on the road in Lake County. This statement could not reasonably have caused apprehension of bodily harm for two reasons. First, as defense counsel asserts, the statement refers to a past act and so necessarily could not be interpreted to communicate a future threat of any kind. Secondly, the statement, by its very conditional nature, necessarily negates any potential threat of

7

bodily harm. Any other interpretation defies logic. Although making this statement was possibly hateful, we do not find any evidence to support a finding that appellant was guilty of misdemeanor assault for making this statement. Based on the foregoing, we hold that the evidence presented was insufficient to allow any rational trier of fact to find essential elements of misdemeanor assault existed beyond a reasonable doubt. We therefore reverse the conviction on the assault charge, and thus need not rule on the issue of venue.

## II

## DISORDERLY CONDUCT

Appellant was convicted of violating § 45-8-101(1)(b), (c), and (d), MCA, which provides:

> **Disorderly Conduct.** (1) A person commits the offense of disorderly conduct if he knowingly disturbs the peace by:
>
> . . .
>
> (b) making loud or unusual noises;
>
> (c) using threatening, profane, or abusive language;
>
> (d) discharging firearms.

Janet Read and appellant had been next door neighbors for roughly five years. Ms. Read testified that on May 20, 1989, she called the sheriff's office concerning a profane sign on the property line between appellant's and Ms. Read's land. Deputy Perry Mock responded to the call. There were four signs, made of paper plates, which displayed powerful profanity, derogatory language, and other unneighborly expletives all directed at Ms. Read. The State admitted two of these signs into evidence during trial.

8

Appellant testified that he had, indeed, posted the signs, his reason being that he considered Ms. Read was trespassing each time she walked up to the fence line; the signs were meant as a warning to stop her from trespassing. Appellant was referring to times when Ms. Read approached the fence, which allegedly lay inside his property line, in order to question him regarding backhoe work performed in his back yard which tended to adversely affect a stream which ran through their properties. Ms. Read and Deputy Mock testified that Ms. Read was very frightened and quite upset with the language on the signs. Ms. Read and the deputy walked over to the fence where the signs had been posted. As Ms. Read and the deputy returned toward the deputy's car, they heard screaming and two gunshots coming from appellant's property. Deputy Mock described the noise as "nerve wracking." Ms. Read identified the screaming as appellant's and testified that the shots and screams were threatening in nature as they were directed toward her and the deputy. Apparently, appellant was angered by these alleged trespassers. According to appellant, he was shooting at a target and yelling at his horse. The jury convicted him of disorderly conduct. Appellant contends that the State failed to prove that appellant had the requisite mental state, arguing that he did not know he was disturbing anyone's peace. We disagree.

Circumstantial evidence is sufficient to establish mental state. State v. Krum (1989), 238 Mont. 359, 361, 777 P.2d 889, 890. The appellant was, according to defense counsel, "almost fanatic" about his property line, and the signs were meant as a

warning for Ms. Read to stop "harassing" him. Appellant testified that he was very protective of his property, that he knew exactly were the boundary line was, and that it lay just a few feet outside of his barbed wire fence. In view of his "fanatic" attitude the jury could have found that the screaming and shooting was directed at the deputy and Ms. Read because the appellant considered them trespassers as they approached the fence. Considering all the evidence together, under these circumstances, we hold that it would be sufficient for any reasonable trier of fact to establish all the elements of disorderly conduct beyond a reasonable doubt. We affirm the jury verdict for this conviction.

III

INTIMIDATION

The jury convicted appellant of felony intimidation in violation of §45-5-203(2), MCA, which provides:

> A person commits the offense of intimidation if he knowingly communicates a threat or false report of a pending fire, explosion, or disaster which would endanger life or property.

The facts alleged in the information regarding intimidation are as follows:

Count I

> That on or about May 23, 1989, in Lake County, Montana, the . . . Defendant, [Felando] knowingly communicated a threat of a pending fire to Janet Read, which would endanger her life and her home.

These threats were recorded by Ms. Read and the tape was played for the jury and admitted into evidence. The tape contained a collection of appellant's vulgar and derogatory remarks all

10

directed to Ms. Read which evidenced the hostility which appellant felt toward Ms. Read. The tape also contained appellant's threat that he planned to "put a bullet through" her neck and threatened to force her to engage in sodomy. In its most pertinent part, the tape revealed appellant's threat of a pending fire:

> I'm warning you, you [expletive], you better back the f___ up or we're talking about burning somebody's place down. I'm surprised your place is still standing, [expletive].
>
> . . .
>
> Now you better watch out or you won't have a house you stupid [expletive]. I see you hiding, J____ C____, you're sleazy f___ing [expletive].
>
> . . .
>
> You better sell that place quick while it's still standing.

Appellant did not deny making the threats, but argues for a different interpretation of the tape. However, the jury was the trier of fact and it was within its province to resolve such a question. Laverdure at 138, 785 P.2d 720. Ms. Read testified that she definitely understood appellant's words as threats to burn her house down. The question of whether an intention to commit a felony is present must be decided on the basis of an objective standard, and "whether a statement constitutes a true threat is to be determined by the trier of fact." State v. Lance (1986), 222 Mont. 92, 104, 721 P.2d 1258, 1267 (citing United States v. Kelner (2d Cir. 1976), 534 F.2d 1020 and United States v. Merrill (9th Cir. 1984), 746 F.2d 458. The threats were made at the culmination of several days of harassment of Ms. Read by the appellant. Ms.

11

Read testified that she was so frightened by appellant that she began hiding in her house, coming out only when necessary. Based on this testimony, the jury convicted appellant of intimidation. In this case we hold that the evidence produced a fear in the neighbor Janet Read that appellant's threats would be carried out. Therefore, we affirm the jury's verdict for this conviction and for the conviction for disorderly conduct, but reverse as to the assault conviction.

John Conway Harrison
_____
Justice

We concur:

_____
Chief Justice

_____
_____
_____

_____
Justices

Justice Fred J. Weber dissents as follows:

I respectfully dissent from the majority's reversal of the misdemeanor assault conviction. The record contains substantial evidence to support the conviction for misdemeanor assault.

In substance § 45-5-201(1)(d), MCA, provides that a person commits the offense of assault if he purposely or knowingly causes reasonable apprehension of bodily injury in another person. While the majority concedes that Mr. Underwood was apprehensive of bodily injury, it concludes such apprehension was not reasonable and so reverses the assault conviction.

We agree with the standard of review cited in the majority opinion: a conviction cannot be overturned if evidence, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find essential elements of the crime beyond a reasonable doubt. State v. Laverdure (1990), 241 Mont. 135, 785 P.2d 718. That case emphasizes that the weight of the evidence and the credibility of witnesses are exclusively to be determined by the jury.

The majority isolates portions of the testimony instead of considering the totality of the circumstances presented by the evidence. During the first encounter on the road, while there was no threat of bodily injury to Mr. Underwood, the defendant was shouting and screaming filthy names at him and stopped only when Mr. Underwood's four-year old son appeared. The second occurrence took place a few days later when Mr. Wood told Mr. Underwood that the defendant had relayed the information that the defendant was

13

going to shoot Underwood if he "messed with him." Wood testified the defendant was serious, that he was red in the face, excited, and screaming. Mr. Underwood testified he took the threat seriously. Mr. Wood testified that Mr. Underwood was scared at the time he conveyed the message to him. The third incident took place a few days later at the Ferndale Market. At that time the defendant started screaming again and calling Mr. Underwood names. He told Mr. Underwood that if the boy hadn't been there, he would have shot him on the road. Mr. Matitus, who was with Mr. Underwood in the store, testified that the defendant was upset, red in the face and yelling bad words. Mr. Matitus further testified that Mr. Underwood was nervous, scared and upset by what the defendant said. Mr. Underwood testified that he took the defendant's threats seriously and believed he meant to do him bodily harm.

The majority has concluded that the apprehension of bodily harm was not reasonable. I suggest that this disregards the testimony of Mr. Wood and Mr. Matitus who both observed that Mr. Underwood was scared. The totality of the circumstances suggests there was a basis for apprehension of bodily harm on the part of Mr. Underwood.

The majority emphasizes the aspect of "messing with" in its review of the testimony of Mr. Wood. It ignores testimony of the same Mr. Wood who observed the apprehension on the part of Mr. Underwood.

Had the jury viewed the evidence in the same manner as the majority does in its opinion, I would be constrained to agree that

14

there was sufficient evidence to support that conclusion. However, in this instance the jury, not the majority, was the trier of fact. I conclude there was clearly sufficient evidence, when viewed in the light most favorable to the prosecution, to allow the jury to find defendant caused reasonable apprehension of bodily injury in Mr. Underwood.

I would affirm the conviction for misdemeanor assault.

_____
Justice

Justice R.C. McDonough concurs in the foregoing dissent.

_____
Justice

Chief Justice J. A. Turnage concurs in the foregoing dissent.

_____
Chief Justice

15