No. 94-192

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

STATE OF MONTANA,

       Plaintiff and Respondent,

  v.

MICHAEL HAROLD ROSS,

       Defendant and Appellant.


APPEAL FROM:    District Court of the Fourth Judicial District,
                In and for the County of Missoula,
                The Honorable Ed McLean, Judge presiding.


COUNSEL OF RECORD:

       For Appellant:

          Craig Shannon, Public Defender's Office,
          Missoula, Montana

       For Respondent:

          Hon. Joseph P. Mazurek, Attorney General; Patricia
          Jordan, Assistant Attorney General, Helena, Montana

          Robert L. Deschamps, III, County Attorney; Betty
          Wing, Deputy County Attorney, Missoula, Montana


Submitted on Briefs:  December 8, 1994

Decided:  January 24, 1995

Filed:  JAN 24 1995

CLERK OF SUPREME COURT,
STATE OF MONTANA

Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

Michael Harold Ross (Ross) appeals his conviction of intimidation, in violation of § 45-5-203, MCA, in the Fourth Judicial District Court, Missoula County. We affirm.

The issues are:

1. Is § 45-5-203, MCA, unconstitutionally overbroad on its face?

2. Is § 45-5-203, MCA, unconstitutional as applied to Ross?

3. Did the District Court err in instructing the jury concerning the term "threat" as used in § 45-5-203, MCA?

4. Is there sufficient evidence to support the jury verdict?

5. Did the District Court err in denying Ross's proposed jury instruction on stalking as a lesser included offense?

6. Did the District Court err in denying Ross's motion to bifurcate the trial and deliberate element #1 and element #3 of § 45-5-203, MCA, separately?

Ross is a resident of Missoula, Montana. Ross disagrees with abortion and is an outspoken "right to life" advocate. Between February 16 and April 9, 1993, Ross sent a series of letters to Dr. Susan Wicklund. Wicklund owns and operates Mountain Country Women's Clinic, a medical clinic in Bozeman, Montana. Part of Wicklund's medical practice includes performing abortions.

Ross sent Wicklund in excess of sixty letters in 1993. The letters described, in graphic terms, an abortion procedure. Ross referred to Wicklund as "mass murderer," "butcher," and "ethnic cleanser." He continually told Wicklund that he would shut her

2

down or die trying.  Ross stated that Wicklund should be torn limb from limb, have her head crushed, and that she should suffer all the pain and torture she had inflicted on defenseless babies.

The day after the 1993 murder of Dr. Gunn, a Florida physician who performed abortions, Ross sent Wicklund a letter stating:  "Too bad about Dr. Gunn in Florida.  I wonder, could it happen in Bozeman?  I   wonder  ."  Then, shortly after the 1993 fire at the Blue Mountain Clinic, a women's health care facility in Missoula, Montana, Ross wrote a letter stating:

> Isn't that just horrible how someone torched Blue Mountain Clinic in Missoula?  Isn't that awful?  Tsk. Tsk.  Do you think it could happen in Bozeman?  DO you think such a horrible thing could happen in Bozeman? What do you think? One thing is for sure:  WE WILL SHUT YOU DOWN.

Wicklund testified that she experienced great fear and anxiety as a result of these letters.  She employed a security guard to patrol the clinic and act as her personal escort.  She purchased a bullet-proof vest and a handgun.  She experienced mood swings and became increasingly upset upon the receipt of each subsequent letter.  She changed her daily routine and was afraid to appear in public.

Other clinic employees testified to the change in Wicklund's demeanor.  These employees observed Wicklund's behavior before and after receiving the letters from Ross.  They testified that the letters upset Wicklund very much.  She would often wait until the end of the day to read the letters because they were so disturbing. One clinic employee testified that "[Wicklund] would get red in the face and her eyes would start to water.  [The letters] were very

3

clearly upsetting to her.  It was almost as if she would stop breathing after she read them." The employees testified that the entire atmosphere at the clinic worsened after Wicklund began receiving the letters from Ross.

Ross did not try to conceal his identity.  He signed all the letters and subsequently admitted that he wrote them.  Prior to being charged, he voluntarily answered questions for Missoula law enforcement officers.  The letters were the sole source of contact between Ross and Wicklund.

On April 16, 1993,  the Missoula County Attorney filed an Information charging Ross with intimidation, in violation of § 45-5-203, MCA.  Ross pled not guilty.  On November 5, 1993, Ross was found guilty of intimidation following a trial by jury.  He was given the maximum statutory sentence of ten years in the Montana State Prison and designated a dangerous offender.  Ross appeals his conviction.

Issue 1

Is § 45-5-203, MCA, unconstitutionally overbroad on its face?

Ross claims that § 45-5-203, MCA, is overbroad on its face and therefore in violation of the United States Constitution.  Ross argues that, regardless of how this statute is applied to him, the statute could be applied to prohibit a variety of protected speech in violation of the First Amendment.  He claims that since the statute could potentially prohibit protected speech as well as unprotected speech, it is overbroad on its face.

4

At the outset, we note that statutes are presumed to be constitutional and we adopt statutory construction which renders them constitutional rather than a construction which renders them invalid. Montana Automobile Association v. Greely (1981), 193 Mont. 378, 382, 632 P.2d 300, 303. Statutes should be read as a whole and should be construed by this Court to further, rather than to frustrate, the legislature's intent. McClanathan v. Smith (1980), 186 Mont. 56, 61-62, 606 P.2d 507, 510.

Generally, an individual cannot challenge the constitutionality of a statute unless he or she claims that his or her rights have been personally violated. This is because one must have standing to bring a case before the court. One exception to the standing requirement is that an individual may challenge a statute's constitutionality on the grounds that it violates the free speech provision of the First Amendment to the United States Constitution. Broadrick v. Oklahoma (1973), 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830. In Broadrick, the United States Supreme Court stated:

> [F]acial overbreadth adjudication is an exception to our traditional rules of practice and that its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from "pure speech" toward conduct and that conduct--even if expressive--falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct. Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect--at best a prediction--cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe. [Citation omitted.1 To put the

5

**matter** another way, particularly where conduct and not
merely speech is involved, we believe that the over-
breadth of a statute must not only be real, but substan-
tial as well, judged in relation to the statute's plainly
legitimate sweep.

Broadrick, 413 U.S. at 615. Broadrick dealt with expressive conduct which is protected under the First Amendment. The requirement that the overbreadth of a statute must be real and substantial has subsequently been applied to statutes regulating pure speech, as well. New York v. Ferber (1982), 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113.

When the overbreadth of a statute is not substantial and real, the statute is not unconstitutional on it face, but rather unconstitutional application of the statute should be dealt with on a case-by-case basis. Ferber, 458 U.S. at 772. A statute which on its face appears to be overbroad may still be held constitutional if it is given a limited construction by the appellate court. Ferber, 458 U.S. at 769.

In State v. Lilburn (1994), 265 Mont. 258, 875 P.2d 1036, cert. denied, U.S. ____, 63 U.S.L.W. 3514 (1995), we adopted the United States Supreme Court's overbreadth analysis in determining that Montana's Hunter Harassment statute was constitutional In Lilburn, we stated:

> Lilburn contends that there are a significant number
> of situations where the law could be applied in an
> unconstitutional manner and urges the Court to "use our
> imagination to think of the various ways the statute
> might be applied against speech or expressive conduct."
> However, the test is not whether hypothetical remote
> situations exist, but whether there is a significant
> possibility that the law will be unconstitutionally
> applied. Broadrick, 413 U.S. at 615, 93 S.Ct. at 2918.

6

Lilburn, **875** P.2d at 1043. In finding the Hunter Harassment statute constitutional, we went on to conclude that "whatever overbreadth **may** exist should be cured through case-by-case analysis of the fact situations where the statute is assertedly being applied unconstitutionally." Lilburn, **875** P.2d at 1044.

In 1983 the United States Ninth Circuit Court of Appeals held the 1981 version of § 45-5-203, MCA, unconstitutionally overbroad in Wurtz v. Risley (9th Cir. 1983), 719 F.2d 1438. The Ninth Circuit stated that the statute as it existed at that **time was** overbroad in that, absent a limiting construction by the Montana Supreme Court, it did not require that the threat be made in such a way that the victim would reasonably fear that the threat would be carried out. Wurtz, 719 F.2d at 1441. The Ninth Circuit also found subsection (c), a threat to without lawful authority **"commit** any criminal offense," to be overbroad in that it could reasonably be applied to many very minor, **victimless** crimes. Wurtz, 719 F.2d at 1442.

In 1985 the Montana Legislature, in direct response to the Wurtz decision,[1] amended § 45-5-203, MCA, as follows:*

---

[1] The preamble to the 1985 bill which amended § 45-5-203, MCA, clearly indicates that the amendments were made in order to rectify the constitutional shortcomings of the **statute.** The preamble states, in part:

> WHEREAS, the language in section 45-5-203, MCA, is not narrowly drawn to punish only those threats that have a reasonable tendency to produce or instill fear in the **victim** which threats traditionally have been punishable; and

> WHEREAS, in Wurtz v. Risley, 719 F.2d 1438 (9th Cir. 1983), the U.S. Ninth Circuit Court of Appeals held that

A person commits the offense of intimidation when, with the purpose to cause another to perform or to omit the performance of any act, he communicates to another, under circumstances which reasonably tend to produce a fear that it will be carried out, a threat to perform without lawful authority any of the following acts:

(a) inflict physical harm on the person threatened or any other person ~~or on property~~;

(b) subject any person to physical confinement or restraint; or

(c) commit any ~~criminal offense~~ felony.

~~(d) accuse any person of an offense;~~

~~(e) expose any person to hatred, contempt, or ridicule; or~~

---

subsection 45-5-203(1)(c), MCA, is aimed at "pure speech" rather than conduct; has an overbreadth that is real and substantial in relation to the statute's **legitimate** sweep; has a chilling effect forbidden by the first amendment of the U.S. Constitution; and, in the absence of any narrowing construction or tightly drawn language, is void on its face for overbreadth; and

WHEREAS, in its holding in Wurtz v. Risley, the court said that the statutory language of subsection 45-5-203(1)(c), MCA, applied so broadly to threats of **minor** infractions, threats not reasonably likely to induce a belief that the threats would be carried out, and threats unrelated to any induced or threatened action, that a **great** deal of protected speech was brought within the statute; and

WHEREAS, the court in Wurtz v. Risley did not address the issue of overbreadth in the remainder of section 45-5-203, MCA, but in its dicta said that a threat must be distinguished from what is constitutionally protected speech, and that threats punishable without violation of the first amendment **must** contain the reasonable tendency that the threat will produce or instill in the victim fear that the threat will be carried out; and

WHEREAS, section 45-s-203, MCA, may contain language that defines elements of the offense of intimidation so that the statute applies too broadly or infringes on protected speech.

THEREFORE, the Legislature of the State of Montana finds it appropriate to amend section 45-5-203, MCA.

[2] Shaded text was added and interleneated text was deleted from § 45-5-203, MCA, by the 1985 Montana Legislature.

8

(f) take action as a public official against anyone or
anything, withhold official action, or cause such action
or withholding.

The 1985 Legislature severely limited what types of threats would constitute intimidation and under what circumstances such threats must be made

Ross argues that while these amendments were a step in the right direction, they did not completely cure the constitutional infirmities in the statute. Ross insists that the problems the Wurtz court found with subsection (c), that a defendant could be convicted of felony intimidation for merely threatening to perform a misdemeanor, still exist in subsection (a). He claims that a defendant can be convicted of felony intimidation under subsection (a) for threatening to perform a misdemeanor assault. This argument is based on the fact that subsection (a) uses the term "physical harm" rather than "serious bodily injury" as set out in the felony assault statute. Physical harm could include such minor injuries as those punishable by misdemeanor assault. Ross argues that to punish the threat to commit an act more severely than the act itself has a chilling effect on speech about which the Wurtz court was concerned.

We find Ross's argument unpersuasive. The Wurtz court was concerned that the threat to commit minor victimless crimes could be punishable as felonies under § 45-5-203(1)(c), MCA. The United States Ninth Circuit Court of Appeals stated:

> [I]t was the breadth of this provision, applying as it does to minor crimes without victims, that caused a federal court to strike down an identical statute in Landry v. Daley, 280 F.Supp. 938, 964 (N.D.Ill. 1968)

9

(three judge court), <u>rev'd on other grounds sub nom.</u> <u>Boyle v. Landry</u>, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971).

.

> [Section 203(1)(c)] would also apply to the citizen who tells city council members that if they fail to lower parking fees she will park without putting a coin in the meter. Threats of sit-ins, marches in the street, mass picketing and other such activities are frequently threats to commit acts prohibited by law.

<u>Wurtz,</u> 719 F.2d at 1442. The examples set out in <u>Wurtz</u> are distinguishable from the hypotheticals proposed by Ross.

Subsection (a), by its very terms, proscribes threatening to commit a crime which has **a victim** Ross has not provided compelling examples of how subsection (a) could chill protected speech, as it merely prohibits one from threatening to "inflict physical harm." Such speech is rarely, if ever, protected. <u>Landry</u>, 280 F.Supp. at 963-64 (concluding that similar language in an Illinois **statute was** neither vague nor overbroad).

Ross has failed to show substantial and real overbreadth, when compared to the statute's plainly legitimate sweep. See <u>Lilburn,</u> 875 P.2d **at 1043.** Ross has provided no compelling examples of how § 45-s-203, MCA, can be applied unconstitutionally. Conversely, § 45-5-203, MCA, clearly has a wide variety of constitutional applications. We conclude that § 45-5-203(1)(a), MCA, is not unconstitutionally overbroad and any purported unconstitutional application of this section should be addressed on a case-by-case basis

**10**

Issue 2

IS § 45-5-203, MCA, unconstitutional as applied to Ross?

Ross claims that § 45-5-203, MCA, is unconstitutional as applied to him. He argues that the letters he wrote to Wicklund were not communicated under circumstances which reasonably tended to produce fear that any threats would be carried out. The amended version of § 45-5-203, MCA, requires that threats be made under such circumstances.

The prosecution presented evidence elaborating on the hostile and dangerous nature of the abortion debate raging in this country. Wicklund testified that she was aware of the violence which surrounds the abortion issue. She was aware of the burning of the Blue Mountain Clinic in Missoula, Montana, the murder of Dr. Gunn in Florida and other acts of violence allegedly performed by "pro-life" activists. She testified that she was personally the victim of previous violent altercations.

The letters from Ross were written expressly for the purpose of persuading Wicklund to stop performing abortions. Ross continually stated, "[w]e will shut you down." Ross stated that Wicklund should be torn limb from limb and suffer a variety of other horrible injuries.

Ross's letters became the most threatening when he referred Wicklund to other acts of violence purportedly carried out in the name of the "pro-life" movement. Ross wrote to Wicklund, "[t]oo bad about Dr. Gunn in Florida. I wonder, could it happen in

11

Bozeman?  I  wonder  .  ."  Then, in a subsequent letter he wrote:

> Isn't that just horrible how someone torched Blue Mountain Clinic in Missoula?  Isn't that awful?  Tsk. Tsk.  Do you think it could happen in Bozeman?  Do you think such a horrible thing could happen in Bozeman? What do you think?  One thing is for sure:  WE WILL SHUT YOU DOWN.

In the context of the abortion debate in this country, with which Ross and Wicklund were both clearly familiar, these letters constitute threats communicated under circumstances which reasonably tended to produce fear that they would be carried out.

Ross's letters expressed more than his political or moral opposition to abortion.  The majority of the letters were directed at Wicklund personally.  They were written to frighten her. We discussed similarly threatening speech in State v. Lance (1986), 222 Mont. 92, 721 P.2d 1258, and concluded that the State had a substantial interest in protecting society from such speech while the benefits derived from such speech were minuscule.  Lance, 721 P.2d at 1266.  We went on to state:

> This type of speech is so inimical to society and plays such a minimal part in the exposition of ideas that the State may constitutionally prohibit it.  An individual cannot be permitted to terrorize members of the public through threats, and then claim protection from prosecution under the First Amendment.  Freedom of speech was never meant to be stretched to the point where more injury is done to society as a whole than good.

Lance, 721 P.2d at 1267.

The totality of Ross's letters, taken in the context in which they were written, constitute threats to commit homicide and arson.

We conclude § 45-s-203, MCA, is constitutional as applied to Ross as his letters were not protected speech under the First Amendment.

## Issue 3

Did the District Court err in instructing the jury concerning the term "threat" as used in § 45-5-203, MCA?

Ross claims that the District Court erred by refusing his proposed jury instructions A-1 and A-10 while accepting the prosecution's proposed jury instruction J. Ross claims that the instructions given by the District Court combined and blurred two distinct elements of § 45-s-203, MCA, **ultimately** confusing the jury's deliberation.

We review jury instructions in a criminal case to determine whether the instructions, as a whole, fully and fairly instruct the jury on the law applicable to the case. State v. Brandon (1994), 264 Mont. 231, 237, 870 P.2d 734, 737. The district court is given broad discretion in instructing the jury and while the defendant is entitled to have instructions on his theory of the case, he or she is not entitled to an instruction concerning every nuance of his or her argument. State v. Webb (1992), 252 Mont. 248, 828 P.2d 1351.

Ross's proposed jury instruction A-1 read as follows:

In determining whether Mr. Ross, in fact, communicated a threat, the question is not whether one could reasonably interpret Mr. Ross' letters as threats. Rather, the question is whether the letters on their face and in the context in which they were conveyed, in fact, constitute true, unambiguous, unconditional and specific threats. "Threatening" language is not necessarily punishable.

13

The District Court refused this instruction because it found that the phrase "in fact, constitute true, unambiguous, unconditional and specific threats" was not proper. This language was dicta from a federal case interpreting a federal statute and has not been adopted in Montana. In response to Ross's argument that this was a proper instruction, the District Court stated:

> No, sir, that is not. That is dicta. That is not the l a w . That is based on a federal statute, [Counsell . That has nothing to do with <u>Lance</u> when they talk about it.

The District Court also refused Ross's proposed jury instruction A-10, which states:

> In determining whether Mr. Ross intended to communicate a " true threat," you must apply an objective standard and determine whether on its face <u>and</u> on the circumstances in which it is made, the speech is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution.
>
> In other words, you must consider what he said <u>and</u> where he said it, the circumstances in which it *was* said.

In place of Ross's proposed instructions A-1 and A-10, the court instructed the jury as follows:

> In determining whether Mr. Ross intended to communicate a threat, the question is not whether one could reasonably interpret Mr. Ross' letters as threats. Rather, the question is whether the letters on their face and in the context in which they were conveyed, in fact, constitute true threats. "Threatening" language is not necessarily punishable.
>
> Implicit *in* the word "threat," as used in the intimidation statute, is a requirement that it be communicated under circumstances which reasonablytendto produce a fear that the threat will be carried out.
>
> Only serious expressions of an intention to take a hostage, murder, inflict serious injuries on persons or property, or commit a felony, for the purpose of accom-

14

plishing some end constitute a threat punishable under the statute.

The question of intention is to be decided on the basis of an objective standard, and whether a statement constitutes a true threat is to be determined by the trier of fact, you the jury.

Ross contends that this instruction confuses what constitutes a "true threat," which must be determined by an objective standard, with whether or not the threat was communicated under circumstances which reasonably tend to produce fear, which must be determined by a subjective standard. We disagree. The instruction given by the District Court, when viewed in light of all the other instructions,[3] was a correct statement of law. The jury was instructed on the elements and requirements necessary for language to be a "true threat." The jury was also instructed on the requirement that the threats be communicated in a manner which reasonably tends to produce fear in the victim. The fact that these two concepts were addressed in the same jury instruction does not render the instruction unduly confusing or misleading.

Ross also argues that the District Court erred in denying his proposed instruction A-10 because he believes the jury should have been instructed that, for Ross's letters to be considered "true threats," Ross must have intended to carry out these threats. Again, Ross has misinterpreted Montana law. A "true threat" must be communicated under circumstances <u>which reasonably tend to produce fear</u> that the threat will be carried out. <u>Lance,</u> 721 P.2d

_____

[3] The District Court also instructed the jury concerning an "objective" standard of review and other limitations and qualifications of what constitutes a "true threat."

15

at 1266; § 45-5-203, MCA. Under § 45-5-203, MCA, it does not matter whether or not the accused actually intended to carry out the threat, only that the threat is communicated in such a way that the victim reasonably fears that the threat will be carried out. The only intent required is that the accused made the threat for "the purpose to cause another to perform or to **omit** the performance of any act." Section 45-s-203, MCA.

In interpreting a federal intimidation statute, the United States Seventh Circuit Court of Appeals stated:

> It **also can** make no difference whether the threatener intends to carry out the threat. [Citation omitted.1 The argument that if there is no intent to carry through, the threat is a pure exercise in freedom of speech is purely verbal and misconceives the nature of threats. When making a threat one hopes not to have to carry it out; one hopes that the threat itself will be efficacious. Most threats, indeed, are bluffs. But if the bluff succeeds in intimidating the threatened person . . it ought to be punished . And a bluff has no more to do with the marketplace of ideas than a serious threat.

United States v. Valasquez (7th Cir. 1985), 772 F.2d 1348, 1357, cert. denied, 475 U.S. 1021, 106 S.Ct. 1211, 89 L.Ed.2d 323 (1986).

We conclude that it is not necessary that the accused intend to carry out the threat; rather, it is only necessary that the threat was made for the purpose to cause another to perform **or omit** the performance of an act. We hold that the District Court properly instructed the jury concerning interpretation and application of § 45-5-203, MCA

Issue 4

Is there sufficient evidence to support the jury verdict?

16

Ross claims that there was insufficient evidence to support the jury's verdict of guilty. The standard of review of the sufficiency of the evidence to sustain a criminal conviction is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Arlington (1994), 265 Mont. 127, 146, 875 P.2d 307, 318.

Ross's insufficient evidence argument is an expansion of his argument above, in essence that, since he never intended to carry out his threats, the threats were not "true threats" and therefore the statutory elements of § 45-5-203, MCA, were not met. He insists the intent to carry out the threat must be proven. Ross claims that in Lance this Court "explicitly adopted this objective intent requirement to be a part of each and every prosecution under the subject statute."

Ross's interpretation of Lance is derived from the following passage:

> [O]nly serious expressions of an intention to take a hostage, murder, inflict serious injuries on persons or property, or commit a felony, for the purpose of accomplishing some end constitute a threat punishable under the statute. However, the question of intention is to be decided on the basis of an objective standard, United States v. Kelner (2d Cir. 1976), 534 F.2d 1020

Lance, 721 P.2d at 1267. From this quote Ross argues that this Court has "explicitly adopted" the entire intent requirement found in Kelner. Counsel has mischaracterized our holding in Lance. Nowhere in Lance did we make proof of the accused's intent to carry out the threat a prerequisite to a conviction under § 45-5-203,

17

MCA. As previously stated, the only state of mind required under § 45-5-203, MCA, is that the threat be made for the purpose to **cause** another to perform **or omit** performance of an act. There is no indication the legislature intended to require proof of the accused's intent to carry out the threat.

We conclude that the prosecution presented sufficient evidence that Ross communicated "true threats" under circumstances which reasonably tended to produce fear in Wicklund that the threats would be carried out and the threats were communicated for the purpose to cause Wicklund to **omit** the performance of an act-- specifically, performing abortions. A rationale trier of fact could have found these elements beyond a reasonable doubt.


## Issue 5

Did the District Court err in denying Ross's proposed jury instruction on stalking as a lesser included offense?

Ross argues that he was entitled to an instruction on stalking as a lesser included offense. Montana's stalking statute, § 45-5-220, MCA, went into effect on April 9, 1993. Ross sent fifty-nine letters to Wicklund before April 9, 1993. Ross sent three letters to Wicklund on April 9, 1993. These three letters were admitted into evidence. Ross **claims** the three letters sent on April 9, 1993, provided sufficient evidence by which a rational trier of fact could have found him guilty of stalking. Ross therefore **claims** stalking is a lesser included offense to intimidation and the jury should have been so instructed.

18

In State v. Ostwald (1979), 180 Mont. 530, 591 P.2d 646, this Court stated that **a criminal** defendant "is entitled to instructions on lesser included offenses if any evidence exists in the record which would permit the jury to rationally find him guilty of a lesser offense and acquit him of a greater." Ostwald, 591 P.2d at 651.

Fifty-nine of the sixty-two letters which constitute the intimidation charge in this case were written before the stalking statute became law. Included in these fifty-nine were the two most incriminating letters, the letter referring to the murder of Dr. Gunn in Florida and the letter referring to the burning of the Blue Mountain Clinic in Missoula. Since the gravamen of the offense occurred prior to enactment of the stalking statute, Ross was not entitled to an instruction concerning stalking as a lesser included offense. It bears emphasizing with respect to our decision that we are not here determining that the offense of stalking either is or is not a lesser included offense of the offense of intimidation. That issue remains to be decided in some future case and controversy.


Issue 6

Did the District Court err in denying Ross's motion to bifurcate the trial and deliberate element #1 and element #3 of § 45-5-203, MCA, separately?

Ross argues that the District Court erred by allowing issue #1, whether the letters constituted "true threats," and issue #3, whether the threats were communicated in such a way that they reasonably produced fear that the threats would be carried out, to

19

be tried together. Ross offered to concede issue #3 and admit that Wicklund subjectively suffered fear and anxiety due to the letters. By doing this, he wished to exclude all evidence concerning Wicklund's fear and focus solely on whether or not the letters on their face constituted "true threats."

We will not overturn a trial court's discretionary ruling absent an abuse of discretion. In Montana Rail Link v. Byard (1993), 260 Mont. 331, 860 P.2d 121, we stated, "[t]he standard of abuse of discretion is applied to discretionary rulings, such as trial administration issues, post-trial motions and similar rulings." Montana Rail Link, 860 P.2d at 125 (emphasis added). In this case the jury was continually made aware of the distinctions between the various elements the prosecution was required to prove. The jury was properly instructed concerning the applicable law.

The District Court determined that the prosecution should be permitted to present relevant, probative evidence to establish each and every element of the offense charged. There is no evidence that the jury was "confused" by the prosecution's presentation of evidence concerning the various elements of the offense. We conclude that it was well within the District Court's discretion to refuse to bifurcate the trial.

Based on our holdings above, we affirm the decision of the District Court.

J. A. Turnage

_____
Chief Justice

20

We concur:

_William E Hunter_

_Tony Trueville_

_Justices_