No. 03-434

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 312

STATE OF MONTANA,

       Plaintiff and Respondent,

  v.

ROMAN SONNY McCARTHY,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and for the County of Gallatin, Cause No. DC 2002-243,
The Honorable Mark L. Guenther, Judge presiding.

COUNSEL OF RECORD:

       For Appellant:

       Brock Albin, Albin Law Office PC, Bozeman, Montana

       For Respondent:

       Hon. Mike McGrath, Attorney General; Micheal S. Wellenstein,
Assistant Attorney General; Carlo Canty, Special Deputy Gallatin
County Attorney, Helena, Montana

       Marty Lambert, Gallatin County Attorney, Bozeman, Montana

Submitted on Briefs: May 4, 2004

Decided:  November 12, 2004

Filed:

_____
Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1 Roman McCarthy (McCarthy) was convicted of Intimidation, a felony, in violation of § 45-5-203, MCA, for threats made to probation and parole officers, a prosecutor and a district court judge. He appeals his conviction. We affirm the District Court.

¶2 There are five issues raised in this appeal:

¶3 1. Whether the District Court should have ordered a competency hearing *sua sponte*.

¶4 2. When McCarthy did not appear the second day of trial, did the District Court err when it accepted McCarthy's written waiver of appearance?

¶5 3. Did the District Court err in denying McCarthy's post-verdict motion challenging the voluntariness of his written waiver of appearance?

¶6 4. Whether there was sufficient evidence to support McCarthy's conviction of Intimidation.

¶7 5. Did the District Court abuse its discretion in denying McCarthy's motion *in limine*?

STANDARD OF REVIEW

¶8 The standard of review for each issue will be contained in the discussion of that issue.

BACKGROUND

¶9 In August 2001, McCarthy was serving a probationary sentence for harassing his previous stalking victim. Probation and Parole Officer Stephen Ette (Ette) was assigned to supervise him. McCarthy wanted to live in Arizona near his brother while on probation, so on August 6, 2001, Ette's supervisor, Bernie Driscoll (Driscoll) issued McCarthy a temporary travel permit to look for a job and a residence in Arizona. The temporary permit

2

required McCarthy to return to Montana because, under the Interstate Compact Policy, he could not be physically residing in Arizona if Montana Probation and Parole decided to request that Arizona accept supervision over him.

¶10 On August 22, 2001, McCarthy telephoned Ette and they discussed McCarthy's job and residence search. Initially, McCarthy was calm and composed, but when Ette informed him that he was required to return to Montana, McCarthy's demeanor changed and he began to yell obscenities at Ette. McCarthy focused his aggression toward Deputy County Attorney Gary Balaz (Balaz), who had prosecuted him on the original charge of stalking. McCarthy stated that Balaz had ruined his life and "he should just come back and put a bullet in the motherfuckin' cocksucker's head." He also stated that if he did have to return to Montana, he was going to do something to ensure he was placed on death row, and he wanted to return to Montana and "do a Columbine on the whole motherfucking courtroom." When Ette was asked to explain McCarthy's statement, he testified:

> I took it that Mr. McCarthy was going to come back to the State of Montana and come into the Law and Justice Center with either numerous weapons or weapons capable of firing semi-automatically and shoot as many people in the courtroom as possible to include Mr. Balaz and Judge Salvagni, myself, or anyone else that was here at that time.

¶11 On September 12, 2001, during another telephone conversation, Ette again informed McCarthy he would have to return to Montana. McCarthy became indignant, yelling there was a conspiracy between Ette and Balaz, and they were ordering his return just to ruin his life. McCarthy then declared "he was bigger and badder than any motherfucking Iranian terrorist." Since terrorists had flown airplanes into the World Trade Center the day before, Ette testified he felt McCarthy was going to return to Montana and cause some type of major

3

event or catastrophe.

¶12 McCarthy also requested that Ette get Driscoll, Judge Salvagni and Balaz together in Driscoll's office and "he would take care of the situation there." Ette testified he believed McCarthy wanted to "get these people together because he focused all of his anger and aggression on them. And that [McCarthy] would do something that would end up placing him, ultimately, in Montana State Prison for the rest of his life. I figured that [McCarthy] would come back and kill them."

¶13 McCarthy requested to speak to Driscoll, and during their conversation, McCarthy asked Driscoll to change his decision about the return to Montana. Driscoll denied his request. McCarthy responded, "If I have to come back there, I'm going to blow Balaz's fucking head off." The next day, a warrant was issued for McCarthy's arrest, he was arrested in Arizona and returned to Montana in July 2002.

¶14 On August 16, 2002, the State charged McCarthy by Information with Intimidation, a felony, in violation of § 45-5-203, MCA, for his threats. McCarthy pled not guilty on August 20, 2002, and the matter proceeded to trial. During the proceedings, McCarthy continually displayed disruptive behaviors. He repeatedly stated he had been set up, that Balaz, the probation officers and the court system were corrupt and he was innocent of the charge. McCarthy also threw salt packets while saying "[t]here's one assault. There's two assaults. There's three assaults. Give me another case on that. That is no different than what they've played with me so far." While in jail, McCarthy attempted to file several incoherent and confusing letters and documents with the court. On November 19, 2002, these documents were returned to McCarthy's counsel, William Bartlett (Bartlett), along with a

4

letter explaining that Judge Guenther had not opened the letters as he was "barred by judicial ethics from reviewing ex parte letters or information during the pendency of or subsequent to a case <u>unless it is presented in open court</u> and notice is given to the other parties."

¶15 On December 6, 2002, McCarthy filed a motion *in limine* requesting the District Court exclude any testimony, evidence and argument mentioning the subjective fears, beliefs or opinions of Driscoll and Ette, and to also exclude his threat as it was not made under circumstances which reasonably tend to produce a fear that it will be carried out. The District Court denied the motion following argument on December 9, 2002, and allowed Driscoll and Ette to testify about their fears and apprehensions derived from their conversations with McCarthy.

¶16 On December 10, 2002, the second day of trial, McCarthy did not appear in court. Bartlett informed the court that McCarthy wished to waive his appearance at trial because the previous evening McCarthy had been in an altercation with the jail staff, which resulted in some injuries to his back and neck and he would not be able to comfortably sit in front of the jury. The prosecutor responded that he preferred McCarthy to be present, but agreed McCarthy had the right to make a knowing, intelligent, and voluntary decision not to appear at trial. McCarthy signed the waiver, which was witnessed by Bartlett, and the court permitted McCarthy to be absent. McCarthy also executed a second written waiver waiving his right to be present when the jury returned its verdict. On December 10, 2002, the jury unanimously found McCarthy guilty of Intimidation.

¶17 On February 27, 2003, McCarthy filed a *pro se* motion for a mistrial, arguing his written waiver of appearance was not freely nor voluntarily given. He testified he did not

know he would lose his chance to go to trial and defend himself by signing the waiver. The next day, after a hearing, the District Court denied McCarthy's motion, found McCarthy to be a persistent felony offender and sentenced him to seventeen years in the Montana State Prison without parole. McCarthy appeals.

## DISCUSSION

## ISSUE ONE

¶18 Whether the District Court should have ordered a competency hearing *sua sponte*.

¶19 McCarthy argues he was not competent to stand trial and assist in his defense, thus, the District Court should have *sua sponte* ordered an evaluation of him before proceeding to or continuing the trial. The State asserts the District Court was not presented with substantial evidence that McCarthy was incompetent, and prior to and during trial, Bartlett never questioned nor presented any medical opinion on McCarthy's competency. We agree with the State.

¶20 When reviewing a district court's finding of competence, we inquire whether substantial evidence supports the district court's decision that the defendant was fit to proceed to trial. *State v. Garner*, 2001 MT 222, ¶ 22, 306 Mont. 462, ¶ 22, 36 P.3d 346, ¶ 22 (citation omitted). Although under certain circumstances a retrospective competency hearing may be held, such hearings are disfavored. *Garner*, ¶ 29 (citation omitted).

¶21 The standard for determining whether a criminal defendant is mentally competent to stand trial is set forth at § 46-14-103, MCA:

> A person who, as a result of mental disease or defect or developmental disability, is unable to understand the proceedings against the person or to assist in the person's own defense may not be tried, convicted, or sentenced for

6

the commission of an offense so long as the incapacity endures. The district court must determine "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding - - and whether he has a rational as well as factual understanding of the proceedings against him." *State v. Bartlett* (1997), 282 Mont. 114, 119, 935 P.2d 1114, 1117 (citations omitted). The doubt raised about competency need not come from the defendant or the defendant's attorney since a court has the duty to order a competency hearing *sua sponte* if it has reasonable grounds for concluding there is a good faith doubt as to a defendant's competency. *Bartlett*, 282 Mont. at 120, 935 P.2d at 1117 (citations omitted).

¶22 When deciding whether to order a competency hearing, the court does not rely on a single indicia of doubt regarding a defendant's competency, but must instead consider the totality of events. *State v. Bostwick*, 1999 MT 237, ¶ 17, 296 Mont. 149, ¶ 17, 988 P.2d 765, ¶ 17 (citations omitted). Indicia of an accused's incompetency necessitating a hearing may include the accused's demeanor at trial, a prior medical opinion on competence, the nature of the crime, past behavior of the accused, and a claimed defense of mental instability. *State v. Garner*, 2001 MT 222, ¶ 23, 306 Mont. 462, ¶ 23, 36 P.3d 346, ¶ 23.

¶23 Here, McCarthy claims there were numerous indicia of mental illness which resulted in an inability to assist his counsel, therefore the District Court should have delayed the proceedings and *sua sponte* ordered an evaluation. However, the District Court was not presented with substantial evidence on McCarthy's incompetence to stand trial. Throughout the proceedings, McCarthy's demeanor was odd and destructive, but his statements to the court demonstrate he understood what was occurring with his case. His statements did not

7

call into question his mental health, but rather, reflected his anger at his belief that he was currently being charged with an offense he did not commit and his ongoing position that he had been improperly charged and convicted of past offenses.

¶24 At McCarthy's first appearance, the District Court specifically asked him whether he was suffering from any illness or disability that prevented him from understanding the proceedings and he answered, "No, sir." McCarthy also told the court he received and read a copy of the Information and understood the general nature of the charges. His responses throughout his initial appearance indicate he thought of himself as the victim of a legal system conspiracy, but also reflect he had a rational and factual understanding of the criminal proceedings against him:

> MR. McCARTHY: . . . I'm going to represent myself. I used to have something until all this stuff started. That's the elegant simplicity of the law. Originally, I never hit anybody. Now I'm up to threatening to kill prosecutors and shit? This is ridiculous. So, I'm going to have to get down to the bottom by myself here with this now.
>
> . . . .
>
> MR. McCARTHY: . . . I never even hit nobody in the beginning of this. Not even one point in the State of Montana have I struck anybody. Now I'm up to killing punk - excuse me, prosecutors? Gary Balaz is the Messiah of malfeasance. I'm going to get him one day legally and that's all I ever told him. Legally, he's going to answer for planting evidence. . . .
>
> THE COURT: . . . Are you prepared to enter a plea to this charge this morning?
>
> . . . .
>
> MR. McCARTHY: Yeah. All right, due to the fast prosecutors with their assistant felony scams, due to the fact that I never hit anybody, all right, and through the mechanics of corruption through this court system, I ended up going to prison, catching ten years on fabricated, false stuff. This next scam

8

here with this threatening to kill this prosecutor and all this crap, last time it was a judge, I mean, it's just been on and on. . . .

¶25 McCarthy also points to documents and letters he submitted to the court and suggests they should have caused the District Court to question his competency. These documents were incoherent and confusing, including one with an elaborate drawing of a mosquito with some poetry. However, a number of his letters were *ex parte* and were subsequently returned unread to Bartlett because the court was precluded from reading them for judicial ethical reasons. Thus, we will not consider these letters on appeal as to whether the District Court should have doubted McCarthy's competency. Similarly, a number of the remaining documents and letters were not filed with the District Court until after the jury found McCarthy guilty, and in some cases after his sentencing. Therefore, these letters and documents are not relevant when determining whether the District Court should have doubted McCarthy's competency because they would not have caused it to have a good faith doubt about McCarthy's competency when they were never before the court.

¶26 Additionally, the defense did not present any medical opinions on McCarthy's competency, request a competency hearing or question his ability to understand the proceedings, answer the allegations against him or assist in his defense. While McCarthy behaved inappropriately at times, his conversations with the District Court and his counsel demonstrate that, although he was angry, he had a rational and factual understanding of the proceedings and the allegations made against him. As such, we conclude the District Court did not have substantial evidence to establish a good faith doubt as to whether McCarthy was incompetent at the time of trial and was not required to order a competency hearing *sua*

9

*sponte*.

## ISSUE TWO

¶27 When McCarthy did not appear the second day of trial, did the District Court err when it accepted McCarthy's written waiver of appearance?

¶28 McCarthy argues the District Court erred when it granted his motion to be tried *in abstentia* without first determining whether the motion was signed knowingly and voluntarily. He proclaims that although his counsel presented him a waiver, there is no indication he was fully advised of the consequences of signing the waiver, specifically that he would relinquish his right to testify later in the trial. He also argues "since it is required that a waiver be given by the defendant in court, on the record, neither the statement by [his] counsel that the defendant waived his right to be present nor the written document was sufficient to result in a waiver." The State asserts the District Court correctly accepted McCarthy's written waiver of appearance as it was made intelligently, knowingly and voluntarily. We agree with the State.

¶29 Whether a criminal defendant's right to be present at the critical stages of his or her trial has been violated is a question of constitutional law, and our review of questions of constitutional law is plenary. *State v. Kennedy,* 2004 MT 53, ¶ 13, 320 Mont. 161, ¶ 13, 85 P.3d 1279, ¶ 13 (citation omitted). We review a district court's conclusions of law to determine whether its interpretation of the law is correct. *Kennedy*, ¶ 13.

¶30 A defendant has a fundamental right to be present at all stages of a criminal proceeding under both the federal and Montana Constitutions. The federal constitutional right to be present at all criminal proceedings is one of the most basic rights contained in the

10

Confrontation Clause of the Sixth Amendment. *State v. Tapson*, 2001 MT 292, ¶ 14, 307 Mont. 428, ¶ 14, 41 P.3d 305, ¶ 14 (*citing Illinois v. Allen* (1970), 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353). Art. II, Sec. 24 of the Montana Constitution states: "In all criminal prosecutions the accused shall have the right to appear and defend in person and by counsel . . . ." Since the right to appear and defend in person is found within Montana's Declaration of Rights, it is a fundamental right. A right is fundamental under Montana's Constitution if the right is either found in the Declaration of Rights or is a right "without which other constitutionally guaranteed rights would have little meaning." *Tapson*, ¶ 15. This Court recognized in 1922, when interpreting an identical provision of the 1889 Montana Constitution, that "the defendant must be present throughout the entire trial." *Tapson*, ¶ 16 (*citing State v. Reed* (1922), 65 Mont. 51, 56, 210 P. 756, 757).

¶31 Section 46-16-122, MCA, outlines those instances in which a defendant may be absent in felony cases after the trial has commenced in his presence. The pertinent portion states:

> (3) After the trial of a felony offense has commenced in the defendant's presence, the absence of the defendant during the trial may not prevent the trial from continuing up to and including the return of a verdict if the defendant:
> . . . .
> (b) is voluntarily absent and the offense is not one that is punishable by death.

¶32 A defendant can waive his fundamental right to be present at trial in two ways: (1) failing to appear, or (2) through an express personal waiver. *Tapson*, ¶ 24. Waiver is defined as the voluntary abandonment of a known right. *State v. Bird*, 2001 MT 2, ¶ 35, 308 Mont. 75, ¶ 35, 43 P.3d 266, ¶ 35 (citations omitted). We will not engage in presumptions of waiver; any waiver of one's constitutional rights must be made specifically, voluntarily,

and knowingly. *Bird*, ¶ 35 (citations omitted). Before a defendant can waive a fundamental right, such waiver, to be recognized by the courts, must be informed and intelligent for there can be no waiver by one who does not know his rights or what he is waiving. *Bird*, ¶ 36 (citations omitted). If a defendant chooses to waive his right to be present at a critical stage of the trial, the court must obtain an on-the-record personal waiver by the defendant acknowledging the defendant voluntarily, intelligently, and knowingly waives that right. *Bird*, ¶ 38.

¶33 McCarthy refers us to *Bird* and *Tapson* to support his proposition that the court erred when it accepted his written waiver of appearance at trial and allowed the trial to proceed in his absence because the court never made a determination of whether his waiver was voluntary and whether he fully understood the implications of his waiver. In *Tapson*, we concluded the District Court violated Tapson's constitutional right to be present during a critical stage of the criminal proceeding when the judge took verdict forms into the jury room without Tapson or his counsel present and without a waiver by Tapson of his constitutional right to be present. We determined Tapson was not apprised of his rights, nor did he personally make a knowing, intelligent and voluntary waiver of his right to be present. In *Bird*, we concluded the District Court violated Bird's constitutional right to be present during a critical stage of the criminal proceeding when it granted the State's motion to conduct individual *voir dire* of some of the prospective jurors in-chambers with both the prosecutor and defense counsel present, but with Bird absent. We determined that Bird not only did not waive his right to be present, he was never afforded an opportunity to waive that right.

¶34 Unlike the defendants in *Tapson* and *Bird*, McCarthy was apprised of his rights

12

through his counsel, he was afforded an opportunity to waive his right, he made a knowing, intelligent and voluntary written waiver of his right to be present, witnessed by his counsel, which was presented to and accepted by the court and is part of the District Court record. In that waiver, McCarthy states he "knowingly, voluntarily and intelligently waives his right to appear."

¶35 McCarthy finds fault with the fact his waiver was presented to him by his counsel and maintains there is no indication he was fully advised of the consequences of the waiver and instead, he should have personally given the waiver in the District Court and on the record. However, as the State points out, the District Court cannot bear the fault for accepting McCarthy's written waiver because unlike *Tapson* and *Bird*, where the defendants were in court and the court could personally receive their waivers, McCarthy chose not to appear in court. His voluntary absence precluded the court from obtaining an on-the-record personal waiver. McCarthy's written waiver was obtained and presented by his counsel. Although McCarthy claims he did not know what he was signing, his counsel explained to the District Court that McCarthy was fully informed and voluntarily signed the waiver. The following discussion occurred prior to beginning the second day of trial:

> THE COURT: Counsel, I understand there's matters that the Court needs to be informed of on the record.
>
> MR. BARTLETT: Thank you, Your Honor. When I arrived at the Law and Justice Center this morning, I learned that there was a problem with Mr. McCarthy in the jail. I went over and found him in a holding cell with two or three other officers there. Roman was in tears and obviously had been crying for some time. His eyes and face are puffy and swollen.
>
> I observed his - - he was sitting in an awkward position on a bed and I observed what I had thought was probably a bad back. And his neck is stiff.

13

He cannot comfortably sit and cannot sit tall in front of the jury.

Last night, Mr. McCarthy apparently was in an altercation with jail staff and the result of that was some injuries to his back and neck. I asked him, "Roman, what do you want to do about this? Do you want to waive your appearance at trial this morning?" And he said, yes, he did. I expect that Roman should be taken to the hospital for an examination as soon as possible.

So I move the Court, pursuant to 46-16-122. sub (3), subparagraph (b), that Roman be allowed to voluntarily absent himself from the rest of the proceedings. The record will note that he was here yesterday at the time the trial commenced. And I don't think it would be in his best interest to appear in front of the jury in his present state. And given his present state, there may even be some sort of blow-up.

So I think it's in his best interest, and he agrees, that he not appear for this morning's proceedings. We have drafted a waiver, which I will present to Mr. McCarthy for his final decision. And upon obtaining his signature, we will file that.

The State countered with its position:

Your Honor, it's the State's position, of course we would prefer the defendant to be here, consistent with his rights. But if it is his knowing and intelligent and voluntary decision not to be here, he has that right pursuant to the criminal code of the State. . . . I would ask that the Court consider the proposed waiver submitted by Mr. Bartlett. It says that the defendant knowingly and intelligently waives his right to appear. Given the precise instructions of the statute, I would ask that the word "voluntarily" be included in that last sentence as well.

Bartlett and the court agreed that "voluntarily" be included, the court granted McCarthy's absence and held the court in recess while Bartlett returned to the Law and Justice Center to obtain McCarthy's signature. The signature was obtained, the waiver was filed in the record, jury instructions were discussed and closing arguments were presented.

¶36    The trial had commenced in McCarthy's presence, therefore, pursuant to § 46-16-122, MCA, he could choose to be voluntarily absent the second day. The written waiver, and the

14

circumstances surrounding that waiver, establish McCarthy was informed of his right to be present, he understood that right, and knowingly, intelligently, and voluntarily waived his right to be present.

¶37 McCarthy also claims the District Court should have ordered a mental health evaluation and conducted a competency hearing to determine whether he was capable of voluntarily waiving his appearance at trial. As discussed before, there was not substantial evidence before the court that McCarthy was incompetent, and neither Bartlett nor McCarthy questioned McCarthy's competence. The District Court had no reason to conduct a competency hearing prior to accepting the waiver.

¶38 We conclude the District Court correctly accepted McCarthy's written waiver of his presence at the second day of trial.

ISSUE THREE

¶39 Did the District Court err in denying McCarthy's *pro se* post-verdict motion challenging the voluntariness of his written waiver of appearance?

¶40 McCarthy moved for a mistrial on February 27, 2003, claiming he did not knowingly and voluntarily waive his presence at trial. At a hearing the following day, McCarthy indicated he could not actually read the document he signed, that Bartlett had not fully explained the waiver and he did not understand the waiver would preclude his testifying, which he wished to do. The District Court denied McCarthy's motion and found his waiver had been knowingly and voluntarily. The District Court also explained to McCarthy that his motion was time-barred and it was an issue more appropriately appealed to us.

¶41 A district court's determination of whether to grant a motion for a mistrial must be

15

based on whether the defendant has been denied a fair and impartial trial. *State v. Dubray*, 2003 MT 255, ¶ 81, 317 Mont. 377, ¶ 81, 77 P.3d 247, ¶ 81 (citation omitted). This Court's standard of review of a grant or denial of a motion for mistrial is whether the court abused its discretion. *Dubray*, ¶ 81. Here, McCarthy mislabeled his post-verdict motion as a motion for mistrial, which must occur during the trial itself. We agree with the District Court that his motion for mistrial is time barred because it occurred after the trial ended. As such, the District Court did not abuse its discretion.

¶42 However, even giving McCarthy the benefit of the doubt, as the District Court did when it allowed his motion to be considered as a motion for a new trial, he fails. The filing of a motion for a new trial is controlled by § 46-16-702, MCA, which provides:

> (1) Following a verdict or finding of guilty, the court may grant the defendant a new trial if required in the interest of justice. A new trial may be ordered by the court without a motion or may be granted after motion and hearing.
>
> (2) The motion for a new trial must be in writing and must specify the grounds for a new trial. The motion must be filed by the defendant within 30 days following a verdict or finding of guilty and be served upon the prosecution.

A motion for a new trial must be filed within thirty days following a verdict or finding of guilt, and there is no provision in the statute for extending the time period. *State v. Gollehon* (1995), 274 Mont. 116, 118, 906 P.2d 697, 699.

¶43 The standard of review of a district court's ruling on a motion for new trial is whether the district court abused its discretion. *State v. Azure*, 2002 MT 22, ¶ 30, 308 Mont. 201, ¶ 30, 41 P.3d 899, ¶ 30 (citations omitted). McCarthy's motion was filed seventy-nine days after the jury found him guilty and therefore, the District Court did not abuse its discretion and correctly recognized the motion as untimely.

16

## ISSUE FOUR

¶44    Whether there was sufficient evidence to support McCarthy's conviction of Intimidation.

¶45    McCarthy argues there was insufficient evidence to sustain a verdict of guilty in this matter, and as such, the jury could not find that the threats McCarthy was convicted of making were made under circumstances that would reasonably produce a fear they would be carried out as required by § 45-5-203, MCA.  The State asserts the opposite.  We agree with the State.

¶46    The standard of review of sufficiency of evidence to sustain a conviction is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Ross* (1995), 269 Mont. 347, 360, 889 P.2d 161, 169 (citation omitted).  "[T]he credibility of witnesses and the weight to be given to their testimony are to be determined by the trier of fact, and disputed questions of fact and credibility will not be disturbed on appeal."  *State v. Ahmed* (1996), 278 Mont. 200, 212, 924 P.2d 679, 686 (citations omitted).

¶47    McCarthy was found guilty of Intimidation in violation of § 45-5-203, MCA, which provides in pertinent part:

> (1) A person commits the offense of intimidation when, with the purpose to cause another to perform or to omit the performance of any act, he communicates to another, under circumstances which reasonably tend to produce a fear that it will be carried out, a threat to perform without lawful authority any of the following acts:
> (a) inflict physical harm on the person threatened or any other person;
> (b) subject any person to physical confinement or restraint; or
> (c) commit any felony.

18

Under this statute, it does not matter whether or not the defendant actually intended to carry out the threat, only that the threat was made under circumstances which reasonably tended to produce fear and resulted in the victim reasonably fearing that the threat will be carried out. *Ross*, 269 Mont. at 360, 889 P.2d at 168. The only intent required is that the accused made the threat for "the purpose to cause another to perform or to omit the performance of any act." Section 45-5-203, MCA; *Ross*, 269 Mont. at 360, 889 P.2d at 168-69. Further, the person who receives the threat can be different from the person whom the threat seeks to compel. *State v. Lance* (1986), 222 Mont. 92, 108, 721 P.2d 1258, 1269. If a person produces a fear in the victims he intended and had the ability to harm a third party, that is enough to constitute intimidation. *State v. Hembd* (1989), 235 Mont. 361, 367-68, 767 P.2d 864, 868-69 (*overruled on other grounds by State v. Loh* (1996), 275 Mont. 460, 914 P.2d 592).

¶48 The victim in this case is Probation Officer Driscoll. When Driscoll told McCarthy he had to return to Montana from Arizona, McCarthy responded if he had to come back to Montana, he was "going to blow Balaz's fucking head off." The critical question then is whether the circumstances were such that Driscoll was reasonable in fearing McCarthy would carry out his threat against Balaz.

¶49 Driscoll, a probation officer for twenty-eight years, met personally with McCarthy and had over twenty telephone conversations with him. Driscoll testified that, based on McCarthy's threats, he feared something might happen to Balaz. Ette also testified he believed McCarthy would return to Montana and shoot Balaz and others.

¶50 McCarthy maintains it was not reasonable for Driscoll to fear he would carry out his

19

threat because he had made other threats in the past, none of which he had acted upon. However, Driscoll explained the threat to kill Balaz was different from McCarthy's previous threats. Unlike the previous threats, this time McCarthy did not de-escalate when given the opportunity to do so, did not retract his threats and remained angry and hostile. Driscoll's testimony provided the jury with sufficient evidence that McCarthy's threat was made under circumstances which reasonably tended to produce fear and resulted in Driscoll reasonably fearing his threat would be carried out. The following testimony, concerning the circumstances surrounding McCarthy's threats and the fear produced by the threats that they would be carried out, was provided by Driscoll to the jury:

> Canty [State's counsel]: [B]ased on your personal observation and speaking with [McCarthy], can you describe his emotional condition?
>
> Driscoll: Yeah, he was agitated. He was very upset. After we'd exchanged a little bit of conversation, he seemed kind of combative. . . . his voice was raised. He was not screaming at the top of his lungs but he was speaking fast and his voice was raised. . . . He did use profanity.
>
> . . . .
>
> Canty: How was it that this conversation concluded? Do you recall?
>
> Driscoll: Yeah, I do, pretty much. I remember feeling kind of at a loss that we had been in an argument of sorts, me insisting that Roman return to Montana and him insisting that he was going to blow somebody's head off. I remember hoping - - I'd known him for a long time. It's not the first time I've heard his voice agitated. I had hoped that he would calm down or that he would say, I'm sorry. You know, I've experienced that with Roman before. That didn't happen. I finally asked him to calm down and I asked him to call me back in two hours, not knowing what else to do and hoping that perhaps he would calm down in the interim.
>
> . . . .
>
> Canty: Can you tell us whether or not you provided an opportunity to make

20

certain of what you're hearing was true. Did you provide him the opportunity to de-escalate from those threats?

Driscoll: I tried to provide him an opportunity to calm down and de-escalate because I've seen Mr. McCarthy de-escalate before.

Canty: What happened when you attempted to do that?

Driscoll: He didn't give an inch or retract what he had said to me. We were still kind of at loggerheads and that was that. Or that was my impression.

¶51 McCarthy also argues that because his threats against Balaz occurred the day after the September 11, 2001, terrorist attacks, Driscoll's and Ette's fears were heightened and irrational. He contends the jury was influenced by the heightened fear surrounding the terrorist attacks, and their fear overshadowed the fact his threats were not made under circumstances which reasonably tended to produce a fear that they would be carried out.

¶52 Section 45-5-203(1), MCA, requires a jury to consider the circumstances under which the threat was given and determine whether the threat reasonably tended to produce a fear that it would be carried out. As the State points out, McCarthy's threat that "he was madder than an Iranian terrorist" used the fear surrounding the September 11, 2001, terrorist attacks to strengthen his threat against Balaz and to scare Driscoll, therefore McCarthy cannot now complain the circumstances surrounding his threat, including the terrorist attacks, made the parties involved and the jury too sensitive or unreasonably influenced.

¶53 Finally, McCarthy suggests it was unreasonable for Driscoll to fear he would carry out his threats because he was in Arizona with little money or means to return to Montana. This suggestion was refuted by Driscoll's and Ette's testimony at trial, which showed sufficient evidence for the jury to find that although McCarthy made threats while in

Arizona, Driscoll's fears were not unreasonable because McCarthy had the resourcefulness to return to Montana to carry out his threats. When reviewing the evidence in a light most favorable to the prosecution, we conclude there was sufficient evidence to support McCarthy's conviction for Intimidation.

ISSUE FIVE

¶54 Did the District Court abuse its discretion in denying McCarthy's motion *in limine*?

¶55 McCarthy argues the District Court erred in denying his motion *in limine* to "exclude any testimony, evidence and argument at trial of any mention of subjective fears, beliefs, or opinions. . . ." He asserts his comments can only be considered a threat if they are "communicated under circumstances which reasonably tend to produce a fear that it will be carried out." Section 45-5-203, MCA. McCarthy claims the statute calls for an objective standard as to whether a reasonable person would believe the threat would be carried out. He contends that by allowing Balaz and Ette to testify about the effect the threats had on them, the District Court converted the test from an objective to a subjective standard. He urges this Court "to find that where no objective evidence of threat exists, subjective statements of fear for oneself or another should not be admitted," and, "there should be at least some *prima facie* evidence of danger or a fear reaction before a witness can give a subjective statement of fear." He asserts that "[a]llowing testimony of a victim's fear into evidence, before showing circumstances in which that fear was reasonable, violates the defendant's right to have the state bear the burden of proof required. . . ."

¶56 The State counters, "[w]hile the intimidation statute requires the jury to determine whether the defendant's threat was given under circumstances which reasonably tended to

22

produce fear that the threat would be carried out, the statute does not preclude the jury from considering a victim's fears or beliefs in making the assessment." It also points out the statute does not require objective evidence of a threat before a victim can testify as to how the victim felt threatened. It asserts the jury must review the impact of the threat on the victim if it is to determine whether the threat tended to produce a fear in the victim that it would be carried out. The State also refers to our prior Intimidation cases to show this type of subjective testimony has been used to determine whether there was sufficient evidence to convict a defendant of the offense. *See Ross; State v. Felando* (1991), 248 Mont. 144, 152, 810 P.2d 289, 294.

¶57 We review a district court's denial of a motion *in limine* for an abuse of discretion. *Dubray*, ¶ 47. Here, the District Court denied McCarthy's motion stating:

> In rationalizing the issue, the Court finds that the subjective statement of fear by the person is a required element of the burden of proof. Whether that's reasonable then becomes an issue of fact for the jury. The jury has to decide.

¶58 Section 45-5-203, MCA, requires the jury to determine whether the defendant's threat was given under circumstances which reasonably tended to produce fear that the threat would be carried out, but does not preclude the jury from considering a victim's fears or beliefs in making the assessment. It does not require objective evidence of a threat before a victim can testify as to how the victim felt threatened. In order to determine whether the threat reasonably tended to produce a fear in the victim that it would be carried out, the jury must review the effect the threat had on the victim in order to consider the circumstances which would reasonably tend to produce the victim's reaction to the threat, and the victim's fear that the threat would be carried out.

23

¶59 McCarthy also argues Driscoll's and Ette's testimony inflamed the passions of the jury and prejudiced his case. As an example, he points to Ette's testimony that "concerned [Ette's] subjective impression of Mr. McCarthy's comments and included not only his fears, but terrible fantasies he imagined coming true with Mr. McCarthy's return." He also contends the prejudicial effect of this testimony was very great and without such testimony, it is unlikely he would have been found guilty given the charge of Intimidation was based on two telephone calls made from Arizona eleven months prior to the filing of the Information and during which he was very upset. He claims there is no indication he intended to carry out his threats, nor any indication those threatened failed to act in the manner they intended as a result of his words.

¶60 The Intimidation statute does not preclude a victim from testifying whether the victim believed or feared the defendant would carry out his threat. As we stated above, a victim must testify, subjectively, whether or not they experienced fear and the jury can determine whether the circumstances justified that fear. The jury should then decide whether that fear is reasonable. The District Court held the prejudicial effect of this type of evidence does not outweigh the relevancy of the proffered evidence since the subjective statement of fear by the person is a required element of the burden of proof. We conclude the District Court did not abuse its discretion when denying McCarthy's motion *in limine*.

¶61 We affirm the District Court on all issues.


/S/ JIM REGNIER


24

We Concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ PATRICIA O. COTTER
/S/ JIM RICE